Harold Baer, J.
These actions were tried simultaneously. In Action No. 2, the plaintiff seeks the following relief: (a) a permanent injunction restraining N. T. A. from distributing or exploiting a motion picture cartoon entitled “ Mr. Bug Goes io Town ”, hereinafter referred to as the “ Mr. Bug cartoon ”, (b) an accounting from N. T. A. of all proceeds received by it from the distribution and exploitation of the Mr. Bug cartoon, (c) a declaratory judgment that the exploitation of the Mr. Bug cartoon by N. T. A. is subject to an “ equitable servitude ” binding on N. T. A. to pay royalties received from the distribution of the cartoon as provided in a contract dated May 24, 1941, between Fleischer Studios and Paramount Studios, Inc., hereinafter referred to as “ Paramount ”,
*19 The basis of plaintiff’s claim is that the 1941 agreement between Fleischer Studios and Paramount was a “ personal agreement” and that Paramount, while it had a right to exploit and exhibit the Mr. Bug cartoon, did not have a right to divest itself of same by selling it. Fleischer also claims that while the agreement was between the Paramount and Fleischer Studios, nevertheless he and his brother, Max Fleischer (a defendant in this action) were individually bound by the agreement and, therefore, had individual rights under the agreement exclusive of the rights of Fleischer Studios.
The major defenses raised by N. T. A. are as follows: (a) that under the May 24,1941 agreement Paramount acquired absolute rights to the Mr. Bug cartoon, and, therefore, had a right to sell the cartoon, (b) that Fleischer was not a party to the agreement and, therefore, could not assert a claim in his individual capacity, (c) that no cause of action could be asserted on behalf of Fleischer Studios since it had been dissolved by a Governor’s Proclamation in 1946 and under the Florida statutes any cause of action had abated, (d) that Fleischer could not assert an action on behalf of Fleischer Studios either in the capacity of trustee or receiver, and (e) that Fleischer’s prayer for a declaratory judgment is wholly academic at this time since his rights against N. T. A. could be no greater than those reserved to him under the 1941 agreement, and that he has no present rights under said agreement.
In Action No. 1, Fleischer sued W. P. I. X. Inc., hereinafter referred to as “ WPIX ’ ’, to recover $100,000 damages for an alleged invasion of his right of privacy in violation of sections 50 and 51 of the Civil Eights Law.
It is Fleischer’s contention in this action that certain motion picture cartoon films on which his name appears as director thereof are being televised over WPIX facilities without his written consent.
The principal defenses to this action are: (a) that there is no invasion of plaintiff’s right of privacy, (b) that there is no violation of the Civil Eights Law, (e) that plaintiff gave written consent to the use of his name in connection with the exploitation of the cartoon films in question, (d) that plaintiff’s name is not being used in connection with any advertising purpose or for purposes of trade.
The underlying facts are similar for both cases. Sometime in the 1920s plaintiff and his brother Max organized Fleischer Studios and they were in the business of producing cartoons. Prior to 1941 they entered into a series of contracts whereby Paramount financed the production of certain cartoons and *20 distributed and exploited the cartoons. In accordance with the terms of these contracts Paramount was to recoup advances for the production of the cartoons out of the proceeds realized from their distribution, and the profits realized were to be shared between Fleischer Studios and Paramount. In 1941 Fleischer Studios was heavily indebted to Paramount and was in financial difficulty. This led to the May 24, 1941 agreement (plaintiff’s exhibit 6) which is the heart of both of these lawsuits. Under this agreement Paramount purchased outright all of the assets of Fleischer Studios, and agreed to advance money for the production of certain new cartoons, among which was the Mr. Bug cartoon and 12 Popeye cartoons. Simultaneously with the execution of the 1941 agreement Dave Fleischer and Max Fleischer delivered to Paramount a letter signed by both by which they adopted and agreed to the terms and conditions of the contract.
Fleischer Studios ceased doing business in Florida and worked out of Paramount laboratories in California. After the production of the cartoons provided for in the 1941 agreement Paramount commenced to distribute same. It stopped distributing the Mr. Bug cartoon in 1946, at which time there remained about $470,000 which had not been recouped by Paramount.
The Mr. Bug cartoon as well as some 200 Popeye cartoons (old and new cartoons) remained in Paramount’s vault until sometime in 1956. In the interim, on May 16, 1946, Fleischer Studios was dissolved by a Governor’s Proclamation for failure to pay taxes, pursuant to a Florida statute (Fla. Stat., §§ 608.29-608.36).
With the advent of television, a new medium for exploitation and distribution of old motion picture films and cartoons was created. Paramount did not have the means of distribution for television, and consequently entered into several arrangements for the sale of the films in its vault.
In July, 1956 Paramount sold several of its motion pictures, including the Mr. Bug cartoon, to one of its wholly-owned subsidiaries, Bainbow Productions, Inc., hereinafter referred to as “ Bainbow ”. This was a forerunner to a package deal which had been arranged between Paramount and N. T. A. for the outright sale of these films, including the Mr. Bug cartoon, to N. T. A. for the specific purpose of distributing them to television outlets.
In September, 1956 an agreement was entered into between N. T. A. and Paramount whereby Paramount sold outright the capital stock of Bainbow, whose only assets were six films entitled: “ Bells of St. Mary’s ”, “ Good Sam”, “ Gulliver’» *21 Travels ”, “ Trio “ Encore ”, and “ Mr. Bug Goes to Town ” (plaintiff’s exhibit 10). Under this agreement Paramount acknowledged its contingent liability to Fleischer Studios for the Mr. Bug cartoon under the May 24, 1941 agreement, and further agreed to indemnify and hold N. T. A. harmless from all damages, losses, etc., in connection with this contingent liability (plaintiff’s exhibit 10, page 4). N. T. A. thereupon undertook to distribute the films that it acquired. There is presently some $470,000 of unrecouped moneys due and owing to Paramount under the May 24, 1941 agreement.
In June, 1956 Paramount entered into an agreement with P. R. M. Inc., WPIX’ licensor, under which Paramount sold to P. R. M. Inc. the Popeye cartoon films which are the subject matter of the suit brought against WPIX.
Finally, it is well to point out that the May 24, 1941.. agreement has been the subject of much other litigation between the parties here and between Fleischer and Paramount in Federal court actions. In none of these cases to date has the plaintiff been successful and while they are not controlling here, I shall refer to them where similar issues were raised and determined.
To determine the issues here involved it will be necessary to construe the agreement of May 24,1941 (plaintiff’s exhibit 6) between Paramount and Fleischer Studios. This can be accomplished best by setting forth the pertinent provisions of said agreement.
Article ‘ ‘ first ’ ’: inter alia, this article cancels all previous agreements between the parties. It then states,
Nothing contained herein shall divest from Paramount or affect the exclusive rights, titles and interests of Paramount in and to the motion picture cartoons and motion pictures and related rights, copyrights and property referred to in subdivision (a) of Article fifth hereof (and Paramount’s exclusive ownership thereof), all as more fully provided in Article fourteenth: hereof, and in and to the motion picture cartoons and related rights, copyrights and property referred to as more fully provided in Article third hereof.
third: The Producer shall and does hereby transfer, sell, assign and convey to Paramount, its successors and assigns, absolutely and forever, throughout the world, free and clear of all liens, encumbrances, pledges, hypothecations, claims and demands whatsoever, each and every motion picture cartoon * • « heretofore or hereafter produced by or for the Producer or any of its predecessors in interest * * 6 on or before August 31, 1341, including but not limited to all parts thereof * * * all characters contained therein or created or used therefor * * * and all rights, licenses, privileges and property therein, * * * all of the foregoing, which has been produced or come into existence, it is hereby confirmed Paramount either already owns * * * or shall and does hereby own absolutely and forever throughout the World, and all of the foregoing which is in the course of production or which shall be produced or come into existence, it is hereby confirmed Paramount shall and does hereby own, absolutely and forever, throughout the world. *22 Paramount may do any and all things, and make any and all uses of any and all of the foregoing and with respect thereto, and shall be entitled to any and all sums derived therefrom forever and throughout the world without any payment or accounting whatsoever to the Producer or to any others.
fourth : Paramount, its successors, assigns and licensees shall have the exclusive right at all times (whether during or after the period of this agreement) to use or causé Or permit the use of the name “ Fleischer Studios ” in and in connection with the production, distribution, use, exhibition, television exploitation of all motion pictures and motion picture cartoons whatsoever * * * and, furthermore, Paramount, its Successors, assigns and licensees, shall have the exclusive right at all times, (whether during or after the period of this agreement) to use or cause or permit the use of either or both the names “Max Fleischer ” and “Dave Fleischer ”, as Paramount shall direct, in and in connection with the motion picture and motion picture cartoons heretofore or hereafter produced in respect to the production or direction of which either of them shall have been or shall be connected.
Article “ninth” first provides that the producer shall acquire and transfer to Paramount all necessary documents and other indicia of ownership relating to cartoons it shall produce and then states in connection with the “ new cartoons ”,
(b) the Producer shall, and does hereby, assign to Paramount, its successors and assigns, forever and for the entire world, all of the Producer’s rights, titles and interest in and to said rights and said documents, and all rights therein and thereunder.
fourteenth : * * * The new cartoons and all parts and other material thereof heretofore or hereafter produced or made hereunder, including but not limited to * * * all characters contained therein or created or used therefor are and shall be the sole and exclusive property of Paramount absolutely and forever throughout the world * * * all rights, licenses and privileges and property therein * * * and all negatives, duplicate negatives, positive prints, lavenders * * * and all rights thereunder; and Paramount shall own all of the foregoing absolutely and forever * * * and Paramount may do any and all things and make any and all uses thereof and with respect thereto, and shall be entitled to any and all sums derived therefrom forever throughout the world without any payment or accounting whatsoever to the Producer or to any others except for the sums to be paid to the Producer as hereinafter provided in Article sixteenth * * *.
seventeenth: (g) * * * Paramount shall have the right to release, distribute, exhibit, use, reproduce, perform, televise and exploit the new cartoon and to cause it to be released, distributed, exhibited, used, performed, televised and exploited in any manner and form * * * and by any method or process now or hereafter known and devised, and at such times as Paramount or its distributors may see fit, throughout the domestic territory, including the right to use, sell, license, distribute and exploit the new cartoon and to cause it to be used, sold, licensed, distributed and exploited for theatrical, non-theatrical, home or any other uses or purposes * * * and the further right to make, alter and cancel such contracts as Paramount or its distributors may in its or their discretion deem necessary, reasonable or proper for the exhibition, performance reproduction, television, use, distribution or exploitation of the new cartoon in or for any part of the domestic territory, all without any necessity for consulting with, or obtaining the consent or approval of, the Producer thereto * *
*23 twenty-seventh : (c) Regardless of any reference to any third party made in this Agreement, nothing herein is intended to or shall be herein construed to give to any third party or person, natural or artificial, any legal or equitable right, remedy or claim, under this Agreement or any part thereof, as against either or both Paramount and the Producer 0 *
twenty-seventh: (f) This agreement and all of its terms and provisions and all rights therein and thereunder shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns but this agreement, nevertheless, is declared to be personal and neither party hereto (except as hereinafter specifically provided) shall assign this agreement or grant any rights therein or thereunder, in whole or in part without the written consent of the other party hereto first had and obtained. Any transfer or assignment of this agreement or grant of any rights thereunder or therein, in whole or in part by Paramount or its successors or assigns to any parent, subsidiary, associated or affiliated corporation or * * * pursuant to any other term or provision of this agreement, shall not require any consent whatsoever of the Producer or of Max Fleischer or Dave Fleischer or any of them but any such transfer, assignment or grant shall not relieve Paramount of any of its obligations hereunder. Nothing herein contained, however, shall prevent Paramount from freely transferring or assigning this agreement or from freely licensing or granting any rights therein or thereunder, as hereinabove provided in subdivisions (g) and (h) of Article seventeenth.
Simultaneously with the execution of the May 24, 1941 agreement, Paramount and the Fleischers (David and Max) entered into a letter agreement, the pertinent provisions of which follow:
“ (1) That they hereby approve of all provisions in said Agreement concerning the use of their names, the name 1 Fleischer ’ and the name ‘ Fleischer Studios ’, all as more fully provided in said Agreement.
“ (2) That they will faithfully and fully perform all of the services that said Agreement specifies they are to perform or Fleischer Studios, Incorporated is to cause them to perform, all as more fully set forth in said Agreement, * * *.
“ (g) * # * Nothing contained herein shall divest from you [Paramount] or affect your exclusive rights, titles and interests in and to any and all of the motion picture cartoons and motion pictures and related rights, copyrights and property referred to in any of the provisions of the said Agreement (and your exclusive ownership thereof), all as more fully provided in said Agreement. ’ ’
While it may be academic, it is well to state at the outset that the meaning of a contract is not found in any particular provision or provisions isolated from all others. A written contract must be read as a whole, each part interpreted with reference to the whole. Only thus is it possible to give effect to the primary and dominant purpose of the contract (Heryford v. Davis, 102 U. S. 235, 244; People v. Gluck, 188 N. Y. 167, 172; Empire *24 Properties Corp. v. Manufacturers Trust Co., 288 N. Y. 242, 248; 3 Williston, Contracts [Rev. ed.], § 618).
Plaintiff bases Ms case against 1ST. T. A. primarily on language in article twenty-seventh (f), declaring the contract to be “ personal ”, and that neither party may assign or grant any rights under the contract without the written consent of the other. From this, he argues that a fiduciary relationship was created, which was breached when Paramount sold the Mr. Bug cartoon to N. T. A., and further that such a sale was void.
To so construe this agreement would amount to no less than letting the tail wag the dog.
Paramount received exclusive ownership of the Mr. Bug cartoon (art. first) ; Fleischer Studios assigned to Paramount all of its right, title and interest in all documents relating to the rights and title in and to the Mr. Bug cartoon (art. ninth). The new cartoons (including Mr. Bug) as well as all the materials and characters therein were “ the sole and exclusive property of Paramount absolutely and forever ” and further, “ Paramount may do any and all things and make any and all uses thereof” (art. fourteenth). All of the many rights Paramount had in connection with the distribution and exploitation of the cartoons are specifically set forth, including the right of sale, all of which flowed from Paramount’s ownership of the cartoons (art. seventeenth [g]). Finally, article twenty-seventh (f) gave Paramount the right to freely assign, license, or grant any of its rights acquired under the agreement.
The agreement (plaintiff’s exhibit 6), when read in its entirety, clearly establishes that Paramount obtained full and complete title to the Mr. Bug cartoon and had an absolute right to sell it to N. T. A. Conversely, it negates the interpretation advanced by Fleischer. If the language of the agreement did not compel this conclusion, then mere justice would do so.
To avoid the sale of Mr. Bug to a television distributor would be tantamount to precluding Paramount from ever receiving any additional revenues from the film. Paramount did not have any facilities for exploitation of its films over television. At the time of the N. T. A. transaction Mr. Bug had remained dormant and unproductive in Paramount’s vaults for approximately 10 years and there were $470,000 of unrecouped advances due to Paramount.
Moreover, under the 1941 contract with Fleischer Studios, Paramount had a duty to use “ its best efforts ” to exploit the film, which it uncontrovertibly did from 1941 to 1946. Would not Paramount be guilty of violating this duty .if it failed to *25 take advantage of a deal which at least had a potential of earning sufficient revenue to repay the unrecouped advances and produce a profit? In this latter connection it again should be noted that Fleischer Studios’ rights under the 1941 agreement were preserved by the very terms of the 1956 agreement between Paramount and N. T. A. (plaintiff’s exhibit 10, p. 4), as well as in the agreement between Paramount and Rainbow (plaintiff’s exhibit 9). It, therefore, follows that Fleischer Studios cannot presently claim any injury suffered by it as a result of the sale of the Mr. Bug cartoon.
Plaintiff’s counsel has directed the court’s attention to a number of eases in support of the argument that the entire agreement was personal in nature and unassignable and therefore the sale to N. T. A. was void. (See Adrian v. Unterman, 281 App. Div. 81, affd. 306 N. Y. 771; Paige v. Faure, 229 N. Y. 114; Nassau Hotel Co. v. Barnett & Barse Corp., 162 App. Div. 381, affd. 212 N. Y. 568.)
In the Adrian case the agreement specifically provided that the only interest one of the parties (Overhamm) had in the plaintiff’s name was in connection with the manufacture, sale and distribution by Overhamm of perfumes bearing Adrian’s name. The court held, in the light of the facts and obvious personal nature of the agreement, that there was no intent by Adrian to vest Overhamm with the unrestricted right to sell the use of the name in the marketing of perfumery (281 App. Div. 81, 85, supra). The writing in the case at bar contains no such limiting expression of intent.
Paige v. Faure (supra) involves a personal contract for the performance of personal services in the future. Such is not the case here.
The Nassau Hotel case (supra) is also inapplicable. A percentage lease transaction was involved there. The court held that where the rent paid to the landlord depended upon the skill, acumen and business skill of a particular tenant to whom the landlord had let the premises on a percentage rental, an inherently “ personal ” situation arose between the parties which could not be defeated by an assignment of the lease.
In addition to the different fact situations, the one great distinguishing feature of this case is that the transaction attacked here took place some 10 years after Paramount had exhausted the last of its best efforts to perform under the agreement. Perhaps plaintiff’s arguments might be persuasive if Paramount had undertaken to divest itself of the responsibility of distributing the film immediately following release. However, the unique *26 circumstances here, clearly remove this case beyond the pale of the restrictive principles governing contracts which are truly, “ personal ” in nature.
Having rejected Fleischer’s thesis, it seems appropriate to comment upon the scope and purpose of the “personal” and “ nonassignable ” aspects of the contract. They are more properly applicable to the financing and option provisions. For example, Paramount was obligated to make available a revolving fund to meet production costs (art. twelfth) ; make specific weekly payments for overhead and what appear to be salaries (art. sixteenth) ; and keep accounts and make reports of revenues to Fleischer Studios (art. seventeenth). These provisions were evidently intended by the parties to be personal and unassignable. Surely, Fleischer Studios had a right to look only to Paramount for its financing and accounting and not be forced into a position where it may have had to depend upon a less affluent or less prominent organization in the industry.
Fleischer Studios was required to produce certain specific films (art. fifth) and cause the Fleischers (Dave and Max) to continue in its employ and devote their exclusive time and services to the production of the films (art. sixth). The Fleischers were the people with the ideas, the know-how and the facilities to produce the cartoons called for in the agreement. It therefore follows that Paramount did not want to be saddled with any substitutes.
Finally, under the option provisions (art. twenty-third) Fleischer Studios obviously did not want to be put in the position of having to produce additional cartoons for someone other than Paramount, and the latter wanted to avail itself of the exclusive services of Fleischer Studios in the event that Paramount wanted any additional cartoons.
This case could be determined on the foregoing analysis and interpretation of the 1941 contract. However, in view of the litigation that has preceded, and in the hope of once and for all ending what appears to be interminable litigation, I shall undertake to decide the other principal questions raised.
I turn now to the question of whether Fleischer has a cause of action individually.
In order for Fleischer to sue in his individual capacity, he must have been party to the agreement or the agreement must have been intended for his benefit. “ To allow a right of action to one not a party to the contract, the condition seems universally to be recognized as necessary that the contract will not merely operate, but shall have been intended, for his benefit.” (Van Clief & Sons v. City of New York, 141 Misc. 216, 219; Simson v. *27 Brown, 68 N. Y. 355-361.) The rights of third persons will be only such as the parties to the contract by which those rights are created intended they should be (Skinner Bros. Mfg. Co. v. Shevlin Eng. Co., 231 App. Div. 656). There is no claim made by the plaintiff that he is a third-party beneficiary of the contract between Paramount and Fleischer Studios. Nor is there anything in the contract which would in any way show that it was intended for his direct benefit within the meaning of the principles enunciated above. I find as a matter of law that any such inference or claim would be untenable.
Turning to the contract itself, I find as a matter of fact that Fleischer’s claim that he may sue in his individual capacity is similarly untenable.
The preamble to the contract states that the agreement is entered into between “ Paramount ” and “ Fleischer Studios.” The contract is signed “ Paramount Pictures Inc.” by “ Austin Keogh, Vice President” and “Fleischer Studios, Inc.” by “ Max Fleischer, President.” Article “ twenty-seventh (c) ”, set forth above, clearly manifests an intention to preclude any third person mentioned in the agreement from receiving any rights or benefits thereunder. The agreement intended that all of the respective rights and correlative duties set forth therein flow only between Paramount and Fleischer Studios.
Fleischer, in support of his contention that he is party to the agreement, relies upon: article “twenty-seventh (f) ”, which he claims requires his written consent to any assignment of contract; article ‘ ‘ nineteenth ’ ’, which concerns itself with the “ credit lines ” that must be given to the Fleischers as producer and director; and article “ twenty-fourth ”, which calls for the exclusive services of the Fleischers for a period of 26 weeks in order to produce the films called for. Here again we find the plaintiff attempting to draw broad and general legal conclusions from isolated portions of the contract, which conclusions are clearly contradicted by a reading of the agreement as a whole.
Finally, Fleischer relies upon the letter agreement, which he asserts was an addenda to the principal agreement. It should be clear that if the Fleischers were parties to the principal agreement, then the letter agreement was superfluous. On the contrary, the obvious purpose of the letter agreement was to have the Fleischers individually agree to perform the services which Fleischer Studios undertook to have them perform. Moreover, the preamble to the letter agreement provided that the execution and delivery of the principal agreement between Fleischer Studios and Paramount was part of the consideration and inducement for the letter agreement.
*28 The next question that arises is whether Fleischer Studios itself, or Fleischer in the guise of a trustee in dissolution or as a receiver, can assert a claim here. The determination of this question is dependent upon Florida statutes governing the dissolution of corporations and the interpretation of those statutes (see Florida Statutes, tit. 34, “ Corporations and Business Trusts ”, §§ 608.29, 608.30).
The above-cited sections provide that a corporation which has been involuntarily dissolved, as was Fleischer Studios, have a continued life for a period limited to three years after dissolution. Any claims the dissolved corporation may have had, after this three-year period, are deemed to have abated (Walder v. Paramount Publix Corp., 132 F. Supp. 912, 917-919 [U. S. Dist. Ct., So. Dist., N. Y., 1955]).
Under section 608.29 of the Florida statutes, when a corporation is dissolved the directors may continue as trustees or a receiver may be appointed by a Circuit Court sitting in Chancery. It is, therefore, clear that, since Fleischer Studios was dissolved on May 16, 1946, by a Governor’s Proclamation, any action which Fleischer may bring in his capacity as trustee has abated. I see no difference between Fleischer’s position as a receiver or as a trustee. He was appointed as a receiver some 13 years after the corporation had been dissolved. I agree with Judge Palmiest, who considered this question in a Federal court action brought by Fleischer, wherein he stated: “ There is no warrant for believing that a receiver has any greater length of time within which to commence a suit than does a trustee. When a Florida corporation is dissolved the Florida courts may either continue the directors as trustees or appoint a receiver * * * The result of the exercise of this choice does not affect the length of time within which suits may be brought by or on behalf of the dissolved corporation. * * * The appointment of plaintiff [Fleischer] did not revive a claim which had died under then existing law, in 1949, three years after the corporation’s dissolution. Nor does his appointment [as a receiver] amount to a ruling by the Florida court to the contrary.” (Fleischer v. A. A. P., Inc., 180 F. Supp. 717, 724-725 [U. S. Dist. Ct., S. D. N. Y.]; Walder v. Paramount Publix Corp., supra; Neville v. Leamington Hotel Corp., 47 So. 2d 8 [Fla., 1950].)
The statutory provisions which extend the life of a dissolved corporation for a limited purpose, as do the Florida statutes involved herein, must be strictly construed. Under the common law, a corporation which was legally dissolved was extinct. *29 ‘ ‘ According to the principles of the common law, a corporation which has been legally dissolved is dead. It no longer enjoys an existence for any purpose. * * * This is true whether the corporation is dissolved voluntarily or involuntarily, and the effect of dissolution is the same whether it results ipso facto from some act or omission of the corporation or through judicial decree.” (16 Fletcher, Corporations, § 8113, pp. 853-854.)
There is nothing in the statute involved here or in the facts, which demonstrates any special saving provision to show that this claim by Fleischer as a trustee or a receiver is not now defunct.
Finally, considering Fleischer’s prayer for a declaratory judgment on the theory that the exploitation of the Mr. Bug cartoon by N. T. A. is subject to an u equitable servitude ”, I find that here too Fleischer’s position is untenable.
Fleischer has no better rights here than he had under the May 24, 1941 agreement. There, through Fleischer Studios, he would be entitled to share in the profits received from the distribution of the cartoon only after Paramount had recouped its advances, which at the time of this action totaled in excess of $470,000. Fleischer’s contingent rights are protected under the agreement between Paramount and N. T. A. However, for a court to make any declaration as to these rights at this time would be premature and at best, an advisory opinion (see Standardbred Owners Assn. v. Yonkers Raceway, 1 A D 2d 882; Matter of Stout, 1 A D 901, 902; Guibord v. Guibord, 2 A D 2d 34, 36; cf. Scott v. Onderdonk, 14 N. Y. 9).
The notion that any fiduciary relationship was created by the 1941 agreement is similarly devoid of any basis in the law or fact. Article ‘‘ twenty-seventh (e) ” clearly states that the agreement was neither “ a partnership ” or a “ joint venture ”, Fleischer Studios and Paramount were dealing with one another at arm’s length, both as independent contractors — one to produce the films and the other to distribute them. While Paramount had a limited duty to account to Fleischer Studios, this in no way placed it in the role of a fiduciary in the general sense of the word. (See Samuel Goldwyn, Inc., v. United Artists Corp., 35 F. Supp. 633, 637 [U. S. Dist. Ct., S. D. N. Y., 1940].)
For all the foregoing reasons, each of which standing alone is sufficient to defeat Fleischer’s (in all of his individual and collective roles) claims here, I, accordingly, direct that the complaint against all of the defendants in Action No. 2 be dismissed and that judgment be entered in favor of all of the said defendants.
*30 I turn now to Action No. 1. The essence of Fleischer’s complaint is that certain Popeye cartoons (119 in number) on which his name appears as “ Director ”, are being televised over the WPIX facilities without his written consent; that this is violative of section 51 of the Civil Rights Law. While Fleischer admits that he gave Paramount the right to use his name in connection with the distribution of the cartoons, he claims that this consent was given “ exclusively ” and “personally” to Paramount and that in any event, the consent was limited and effective for only a period of 10 years.
Of the 119 Popeye cartoons in question, 107 were produced prior to 1941 and 12 were produced subsequent to 1941 pursuant to the May 24,1941 agreement.
WPIX acquired these films in June, 1956, through a licensing arrangement with a corporation known as PRM, Inc. PRM purchased the Popeye cartoon films from Paramount, subject to the rights of King Features Syndicate, Inc., or Hearst Corporation (hereafter referred to collectively as “King Features ”) the copyright owner of a comic script known as “ Thimble Theater ” — on which the cartoon films were based. PRM also entered into several agreements with King Features whereby it acquired the necessary additional rights to enable it to televise the cartoons.
A kinescope of a Popeye program was shown to the court during the trial, which counsel agreed was a typical program. The program is on for one-half hour Mondays to Fridays over Channel 11. It is devised principally for children and advertises products primarily for young viewers. Part of the program is televised live while the bulk of it, that is, the “ Popeye ” cartoons, are on film. The live portion of the program consists of an announcer or master of ceremonies. He introduces the program and comments on the products of the sponsors. This is the commercial aspect of the program. He then introduces the “ Popeye” cartoon which is shown for about five or six minutes. After the first cartoon is shown the camera is then directed to the master of ceremonies, who makes some comments about the cartoon, and then talks about the products of the sponsors. When the second commercial is completed, a different cartoon is shown, and when that is finished, another short commercial or announcements take place. At times a cartoon is interrupted in the middle, at which time the announcer gives another commercial and then the cartoon is completed. In all of the cartoons shown (usually three per program) Dave Fleischer’s name appears with the title at the beginning of the film as “ Director ”.
*31 There is no connection between the commercial spoken by the master of ceremonies and the “ Popeye ” cartoon films. They are separate and distinct aspects of the program.
The pertinent provisions of section 51 of the Civil Bights Law provide: “Any person whose name * * * is used within this state for advertising purposes or for the purposes of trade without written consent first obtained * * * may maintain an equitable action in the supreme court * * * against the person, firm or corporation so using his name * * * to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person’s name * * * in such manner as is forbidden or declared to be unlawful # * * the jury, in its discretion, may award exemplary damages. But nothing contained in this act shall be so construed as to prevent any person, firm or corporation, * * * from using the name * * * of any * * * artist in connection with his * * * artistic productions which he has sold or disposed of with such name * * * used in connection therewith.”
The argument raised by Fleischer that this consent was exclusively given to Paramount, that it was personal and could not be assigned without his further written consent, is permeated with the same legal infirmities as is his similar contention in Action No. 2 —and for the same reasons previously discussed.
The right to the use of the names was an inextricable part of the absolute ownership rights which Paramount acquired under the May 24, 1941 agreement. Moreover, it is well to point out here that taking cognizance of the practices involving “ credits ”, employed in the movie industry, one cannot help but conclude that Paramount not only had the right to list Fleischer’s name as the “Director”, but was under an obligation to do so. The same applies equally to any successor in interest from Paramount.
The very terms of article “fourth” and “nineteenth” (plaintiff’s exhibit 6) belie Fleischer’s contention that only Paramount had the necessary consent to the use of the names.
While not binding here, it is worthy of note that in a previous action in this court (Fleischer Studios v. W. P. I. X., N. Y. L. J., Sept. 10, 1956, p. 6, col. 3) Mr. Justice Benvenga in denying a motion for a temporary injunction restraining W. P. I. X. from televising the cartoons, held that all rights in the cartoons were sold without any reservation that would prevent their exhibition on television. (Also, see, Fleischer v. A. A. P., Inc., 163 F. Supp. 548, 560.)
*32 I find that there is no basis to Fleischer’s contention that the consent given was limited to 10 years from the date of the release of each of the Popeye cartoons. This 10-year period is referred to in a number of contracts between King Features and Fleischer Studios entered into prior to 1941 (plaintiff’s exhibits 12 to 15). Under these contracts King Features, the copyright owners of Popeye cartoons, granted a 10-year license to Fleischer Studios to produce and distribute (through Paramount) certain Popeye cartoons. In order to insure the limitation of the license period, Fleischer Studios was required, upon the expiration of the 10-year period, to provide King Features with proof of loss or destruction of all negatives or duplicate negatives of the cartoons. Fleischer Studios further agreed on its behalf as well as Paramount’s, that the cartoons would not be distributed, exploited, or exhibited, after the 10-year period.
Clearly this limitation was solely for the benefit of King Features, and in no way can these contracts be construed to infer that this was a limitation on the consent granted by Fleischer to the use of his name.
King Features gave its consent to PRM to exhibit and distribute the Popeye cartoons over television facilities (plaintiff’s exhibits 17 and 18).
Fleischer having given his written consent to the use of his name in connection with the distribution of the Popeye cartoons (articles “ fourth ” and “ nineteenth ” of the May 24, 1941 agreement and the annexed letter agreement of even date; plaintiff’s exhibit 6) cannot now complain of an invasion of his rights under section 51 of the Civil Rights Law (White v. White Corp., 160 App. Div. 709; Sherwood v. McGowan, 3 Misc 2d 234).
Going one step further — I find that Fleischer is not entitled to recover for the additional reason that his name was not used for “ advertising purposes ” or for 11 purposes of trade ” within the meaning of the statute.
The right of privacy in this State is statutory (Roberson v. Rochester Folding Box Co., 171 N. Y. 538). The statute was born of the need to protect the individual from selfish exploitation of his personality and to protect the sentiments, thoughts and feelings of an individual (Hofstadter, Development of the Right of Privacy in New York [1954], p. 12). While the statute should be construed to accommodate the law to the social needs it seeks to accomplish (see Lahiri v. Daily Mirror, 162 Misc. 776, 779), it should not be so construed as to open the gates to baseless and frivolous litigation (Roberson v. Rochester Folding Box Co., supra).
*33 The mere use of a name in a picture which was part of a sponsored television program does not ¿pso facto constitute a use for advertising purposes. To constitute such a use there must be an exploitation of the name in the commercial announcement or in direct connection with the product itself (see Gautier v. Pro-Football, 278 App. Div. 431, 434-435, affd. 304 N. Y. 354). There is no claim here, or at least any that can be substantiated by the facts, that Fleischer’s name was in any way connected with the commercial or sponsored aspects of the program.
Insofar as trade purposes are concerned, this is not a situation where one is singled out from a crowd and unduly featured (Blumenthal v. Picture Classics, 235 App. Div. 570, affd. 261 N. Y. 504) or where there is the commercialization of one’s personality, exploits or experiences in a form distinct from the dissemination of news or information (Binns v. Vitagraph Co., 210 N. Y. 51; Sutton v. Hearst Corp., 277 App. Div. 155).
In each of these cases an individual, his personality, or experiences were exploited for a gain. Not so in the case of Fleischer. The credit line listing him as director was an inextricable part of the cartoon. He had a right to be so listed, and, moreover, he wanted to be listed as such. Privacy under these circumstances seems to be the one thing that Fleischer did not want. (See concurring opinion of Judge Desmond [now Ch. J.] in Gautier v. Pro-Football, supra, p. 361.) Plaintiff has wholly failed to demonstrate that his privacy was invaded.
Accordingly, the complaint is dismissed and judgment may be entered for the defendant.
Defendants in both cases have asked for substantial costs in light of the great amount of previous litigation involving this controversy and the lack of good faith on the part of the plaintiff in bringing this action. While it is true that there has been much litigation involving this same May 24, 1941 agreement, I do not feel that costs in this action should be awarded for all the previous litigation. I accordingly award costs to the defendants N. T. A. Pictures, Inc. only in Action No. 2 and to the defendant in Action No. 1.
All parties waived formal findings of fact and conclusions of law. This is the decision of the court in both cases and judgments may be entered accordingly. Ten days’ stay, 60 days to make a ease. All exhibits are with the Clerk of Special and Trial Term, Part XXII.