**FLEISCHER STUDIOS, INC., Plaintiff,**

v.

**A.V.E.L.A., INC.; Artnostalgia.Com, Inc.; X One X Movie Archive, Inc.; Beverly Hills Teddy Bear Co.; Leo Valencia, Defendants.**

Case No. 2:06–cv–06229–FMC–MANx.

United States District Court, C.D. California.

Dec. 16, 2008.

Borchien Lai, Mark Steven Lee, Manatt Phelps and Phillips, Los Angeles, CA, for Plaintiff.

Douglas D. Winter, The Ball Law Firm LLP, James E. Doroshow, Fox Rothschild LLP, Los Angeles, CA, Anthony M. Keats, Keats McFarland & Wilson LLP, Beverly Hills, CA, for Defendants.

## ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND A PERMANENT INJUNCTION AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

FLORENCE–MARIE COOPER, District Judge.

The matter is before the Court on Plaintiff's Motion for Summary Judgment and a Permanent Injunction (docket no. 48) and Defendant's Motion for Summary Judgment (docket no. 53), both of which were filed on March 19,2008. The Court has read and considered the moving, opposing, and reply documents submitted in connection with these motions. The Court heard arguments of counsel on Monday, August 25, 2008; thereafter, the matter was taken under submission. For the reasons and in the manner set forth below Plaintiff's Motion is DENIED and Defendants' Motion is GRANTED in connection with Plaintiff's copyright infringement claim (Claim 1); the Court RESERVES RULING on and ORDERS supplemental briefing regarding Plaintiff's trademark and unfair competition claims.

## I. EVIDENTIARY RULINGS

Rather than draw the Court's attention to the pertinent portions of the Handman

Declaration, Defendants have tasked the Court with poring over and ruling on boilerplate objections to statements in virtually every paragraph of the declaration of Stanley Handman ("Handman Declaration") and portions of the declaration of Mark Fleischer ("Fleischer Declaration") submitted in support of Plaintiff's Motion. The Court declines to rule on these matters *in toto* and, instead, briefly addresses the relevant objections throughout this Order to the extent the Court relies on a challenged statement rather than the piece of evidence referenced as an exhibit in support of the statement. However, the Court notes as an initial matter that statements in neither the Handman Declaration nor the Fleischer Declaration are dispositive here; the Court does not rely on any improper legal conclusions or otherwise inadmissible statements made by Handman or Fleischer in rendering this decision. Additionally, Defendants' various objections to statements in the declaration are overruled to the extent that statements by Mr. Handman and Mr. Fleischer represent permissible lay opinion testimony or are based on personal knowledge, *e.g.*, from Mr. Handman's service as general counsel "for Max Fleischer and the company he formed, Fleischer Studios, Inc." "for the past fifty years." Handman Decl. ¶ 2.

Pursuant to Federal Rule of Evidence 201, the Court grants Defendants' Request for Judicial Notice of the "Certificate of Status of Domestic Corporation" issued by the California Secretary of State. The Court also takes judicial notice of the fact that Plaintiff, Fleischer Studios, Inc., became incorporated under the laws of the State of California on June 10, 1992. The Court grants Defendants' Request for Judicial Notice of published decisions in three prior cases involving the Fleischer family and/or businesses for the limited purpose of establishing the fact of that prior litigation, the actions taken by the courts hearing those cases, and the undisputed facts memorialized in those public records. Fed.R.Evid. 201(b)(2); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir.2001) ("On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." (internal quotations and citation omitted)).

## II. BACKGROUND

This action arises out of a dispute over the ownership of intellectual property rights in Betty Boop, a cartoon character that has appeared in cartoon films and other media since the early 1930s. Betty Boop cartoons appeared on television beginning in the 1950s; she also appeared in motion pictures, television specials, television advertisements, and an extensive range of licensed merchandise. The now well-known Betty Boop character was created for Fleischer Studios, Inc., a New York corporation, in the early 1930s. Betty Boop, not a party to this action, is a small, shapely, and distinctly feminine figure with short, curly black hair, large eyes, and pouting lips on a disproportionately large head.[1]

---

1. Deciding an infringement action in 1934, the Second Circuit described a booklet of "a series of original unpublished cartoons in various poses and expressions of a certain female character having a unique and original face, pouting in baby fashion." The work was copyrighted by the erstwhile Fleischer Stu- dios, Inc., a New York corporation, on July 29, 1931. The court described the character contained therein as follows:

 There is the broad baby face, the large round flirting eyes, the low-placed pouting mouth, the small nose, the imperceptible chin, and the mature bosom. As the late

Plaintiff concedes that it does not own the copyrights in any of the original cartoon films in which Betty Boop appeared; however, Plaintiff claims: (a) equitable and legal ownership (as the "legal and/or beneficial owner") of the copyright in the character, and (b) federally registered and common law trademarks in the name and image of Betty Boop. With this litigation, Plaintiff asserts the following claims against Defendants A.V.E.L.A. Inc. ("AVELA"), Art–Nostalgia.Com., Inc. ("Art Nostalgia"), X one X Movie Archive, Inc. ("X one X"), and Leo Valencia ("Valencia"), the President, CEO, sole officer, sole shareholder, and sole employee of the defendant corporations: (1) federal copyright infringement, (2) federal trademark infringement, (3) federal false designation of origin, (4) state law trademark infringement and unfair competition, and (5) state law deceptive trade practices. These claims are based on Defendants' involvement in the creation and sale of allegedly unauthorized Betty Boop merchandise, which includes or incorporates restored "vintage" movie posters depicting Betty Boop. Defendants maintain that the original posters are in the public domain and, thus, Defendants' use of the restored poster artwork constitutes neither copyright nor trademark infringement.

The Court summarizes here the uncontroverted facts relevant to its analysis.

## A. FLEISCHER STUDIOS' CORPORATE HISTORY

It is undisputed that the original Fleischer Studios, a New York corporation, was incorporated in 1929. The original Fleischer Studios, Inc. ("FSI NY1") was formed by Max Fleischer and others.[2] In or about 1938, a new Fleischer Studios, Inc., was formed by Max Fleischer and his brother, David "Dave" Fleischer, and was incorporated in Florida ("FSI FL"). In 1928, all the assets of FSI NY1 were distributed to FSI FL. On May 24, 1941, Paramount Pictures, Inc. ("Paramount") purchased all of the assets of the original FSI.[3] FSI FL was dissolved in 1946. *Fleischer v. W.P.I.X. Inc.*, 30 Misc.2d 17, 20, 213 N.Y.S.2d 632, 636 (N.Y.Sup.1961) ("[O]n May 16, 1946, Fleischer Studios [FSI FL] was dissolved by a Governor's Proclamation for failure to pay taxes, pursuant to a Florida statute."). Thus, the original FSI or "Flesicher Studios" ceased to exist by 1946.

More than 25 years later, at some point prior to Max Fleischer's death in September 1972, Max Fleischer and his heirs formed a new Fleischer Studios, Inc. as a New York corporation ("FSI NY2").[4] The Plaintiff in this action, Fleischer Studios, Inc., is a California corporation ("Plaintiff" or "FSI CA") that was incorporated in

and learned Judge Coleman who granted a preliminary injunction to the appellee stated: 'It was a unique combination of infancy and maturity, innocence and sophistication' as depicted. *Fleischer Studios v. Ralph A. Freundlich, Inc.*, 73 F.2d 276, 277–78 (2d Cir.1934) (internal citation omitted).

2. "During the period from 1929 to 1942, Dave and Max Fleischer and the Fleischer corporations produced hundreds of animated motion picture cartoons. The best known of such creations included 'Popeye,' 'Betty Boop,' 'Superman,' 'Screensongs' and several full-length animated motion picture cartoons. All of these cartoons were distributed by Paramount Pictures Corporation." *Fleischer v. A.A. P., Inc.*, 163 F.Supp. 548, 554 (D.C.N.Y. 1958).

3. For purposes of this Order, the Court refers to FSI NY1 and FSI FL, collectively, as "the original FSI."

4. Defendants purport to dispute sworn statements in the Handman Declaration on this point; however, Defendants point to no controverting evidence.

1992, at which point FSI NY2 was "merged into" Plaintiff. Handman Decl. in Support of Pl's Reply ("Handman Reply Decl.") ¶ 4, Ex. 46.

## B. BETTY BOOP WORKS

A recognizable version of Betty Boop appeared in more than 30 works, including cartoon films and booklets, for which copyright registrations were filed in the years 1930 to 1932. Those include the following works, registered as follows and referenced in Plaintiff's Complaint:

| Title (type of work) | Registrant | Date of Registration |
| --- | --- | --- |
| *Dizzy Dishes* (film) | Paramount | August 9, 1930 |
| *Silly Scandals* (film) | Paramount | May 23, 1931 |
| *Betty, Cartoon Character* (booklet) | Original FSI | July 1, 1931 |
| *Minding the Baby* (film) | Paramount | September 26, 1931 |
| *Betty Boop for President* (film) | Paramount | November 2, 1932 |
| *Betty Boop and Her Gang* (booklet) | Original FSI | December 19, 1932 |

All the Betty Boop cartoon films, including the four listed above, were produced by the original FSI and financed by Paramount. The parties do not dispute that Paramount is designated as the "author of the motion picture" on the copyright registration certificates for each of the cartoons before the Court in this action. The copyright Registration certificates for the two Betty Boop booklets listed above reflect that FSI is the registrant; no author is identified on the certificates.

## C. 1941 CARTOON FILM AGREEMENT

With the May 24, 1941 agreement between the original FSI and Paramount, the original FSI assigned to Paramount all of its assets, including all the rights in all cartoon films and all of the characters contained therein. Pl's Ex. 4; Defs' Ex. F. The 1941 Cartoon Film Agreement provides in relevant part: [5]

> The Producer [original FSI] shall and does hereby transfer, sell, assign and convey to Paramount, its successors and assigns, absolutely and forever, through-

out the world, free and clear of all liens, encumbrances, pledges, hypothecations, claims and demands whatsoever, *each and every motion picture cartoon* (whether or not one-reel, two-reel of feature length or in black and white or in color) *heretofore and hereafter produced by or for the Producer* or any of its predecessors in interest and *which have been or shall be released* in the United States of America by or for the Producer or Paramount or any of their respective predecessors in interest (or any of their respective subsidiaries or affiliates) *on or before August 31, 1941, including but not limited to all parts thereof,* all cut-outs not actually included therein, *all characters contained therein or created or used therefor, all copyrights, copyright renewal and extension rights* and renewed and extended copyrights *therein and thereto* (and Paramount shall also have the right to obtain and acquire such renewals and extensions and such renewed and extended copyrights in the name of the Producer and otherwise and the Producer shall also assign to Paramount, it

---

5. For purposes of this Order, the Court refers to the May 24, 1941 Agreement as the "1941 Cartoon Film Agreement."

successors and assigns, all such renewed and extended copyrights when the same shall come into existence) . . .

Pl's Ex. 4 at FS00942 (emphasis added).

Also on May 24, 1941, the date of the 1941 Cartoon Film Agreement between the original FSI and Paramount, Max Fleischer, President of the original FSI, and Dave Fleischer, Secretary of the original FSI, entered into a separate letter agreement with Paramount, which included the Fleischer brothers': (a) approval of all of the provisions of the 1941 Agreement regarding the use of their names and the names "Fleischer" and "Fleischer Studios"; (b) assurance that all prior agreements between the Fleischer brothers (personally) and Paramount were terminated, and that "[n]othing contained herein shall divest you or affect your exclusive rights, titles and interests in and to any and all of the motion picture cartoons and motion pictures and related rights, copyrights and property referred to in any of the provisions of [the 1941 Cartoon Film Agreement], all as more fully provided in said Agreement." Defs' Ex. G at FS00936.

### D. 1941 DRAWINGS AND BOOKLET AGREEMENT

On July 11, 1941, the original FSI assigned to Paramount all of its copyright and renewal interest in and to several drawings and books, including the two booklets listed above: *Betty, Cartoon Character* and *Betty Boop and Her Gang.* Pl's Stmt. of Genuine Issues ¶ 18. The July 11, 1941 Booklet Agreement,[6] provides, in pertinent part, that the original FSI assigned to Paramount "all of [its] right, title and interest in and to the copyrights heretofore taken out by [original FSI] listed below, of which we are the

proprietors." Defs' Ex. H at FS00064. The listed items included the *Betty, Cartoon Character* and *Betty Boop and Her Gang* booklets, and the agreement further provided:

With all of our literary property, right, title and interest in and to the foregoing, and all rights whatsoever under said copyrights, and all the profits, benefits and advantage that shall or may arise from printing, publishing, vending and otherwise using the same, to hold and enjoy the same, forever and throughout the world, hereby *authorizing the said Paramount Pictures, Inc., its successors and its assigns, and its or their designees, to apply for and receive the renewals and extensions of said copyrights,* in the name or names of said Fleischer Studios, Inc. and any others, said Fleischer Studios Incorporated hereby *agreeing to assign and to cause the assignment of, such renewal and extended copyrights, as an when the same shall come into existence, to said Paramount Pictures, Inc., its successors and assigns.*

*Id.* at FS00072 (emphasis added).

### E. FURTHER ASSIGNMENTS/TRANSFERS BY PARAMOUNT

Beginning in the mid–1950s, Paramount entered into various agreements whereby Paramount assigned rights in the Betty Boop works to various other entities. The parties' disagreements about the effect of those agreements, and others by the assignees, lie at the heart of this litigation. Plaintiff contends that all the rights of any and all potential claimants have subsequently been granted to Plaintiff. Defendants maintain that Betty Boop, the char-

---

**6.** For purposes of this Order, the Court refers to the July 11, 1941 Agreement as the "1941 Booklet Agreement."

acter, has been irretrievably injected into the public domain.

### 1. November 19, 1955 Assignment to UM & M

By an agreement dated November 19, 1955, Paramount assigned numerous cartoon films, including the four cartoon films listed in Plaintiff's Complaint, to UM & M TV Corp. ("UM & M"). Pl's Stmt. of Genuine Issues ¶ 19. With that agreement, which the Court will refer to for purposes of this Order as the "Paramount–UM & M Agreement," Paramount assigned "all of Paramount's right, title and interest" in and to the cartoon films and "any copyrights subsisting therein." Defs' Ex. I at FS00528 (paragraph 4(a) of the Paramount–UM & M Agreement). The parties do not dispute that UM & M timely renewed the copyrights in the four cartoon films referenced in the Complaint in 1958 and 1959; [7] Defs' Ex. L, they do dispute, as discussed in more detail below, the effect of those renewals.

### 2. June 27, 1948 Assignment to Harvey

By an assignment dated June 27, 1958, Paramount assigned to Harvey Films, Inc. ("Harvey") 220 cartoon films and other short subjects, including the booklet *Betty Boop and Her Gang*. Specifically, Paramount assigned to Harvey "all right, title and interest of Paramount in and to the copyrights of all the cartoon characters listed in Exhibit A," and included in List A is the booklet *Betty Boop and Her Gang*.[8] The booklet *Betty, Cartoon Character* was not included in the assignment.[9] Pl's Stmt. of Genuine Issues ¶ 20.

### 3. 1980 Quitclaim to CBS

The parties do not dispute that Paramount quitclaimed whatever Betty Boop character rights it still possessed to CBS, Inc. ("CBS") in 1980, in connection with contemplated projects.[10] Pl's Ex, 26 (transferring to CBS "all right title and interest, if any, of [Paramount] in and to the dramatic and musical live stage rights, theatrical motion picture rights, and certain allied and incidental rights ... concerning the fictitious character "Betty Boop"; all of the literary and artistic elements that compose the character in all media everywhere, including but not by limitation the renewal copyrights in [*Betty, Cartoon Character*] and [*Betty Boop and Her Gang*], all uses of the character ...").

7. The parties agree that UM & M, as "proprietor of copyright in a work made for hire," obtained renewals of the cartoon films as follows: *Dizzy Dishes* on August 30, 1957, *Silly Scandals* on August 1, 1958, *Minding the Baby* on December 30, 1958, and *Betty Boop for President* on November 10, 1959. Paramount is identified as the author who contributed copyrightable material to the works. Pl's Stmt. of Genuine Issues ¶¶ 8, 22.

8. With a renewal registration dated December 28, 1959, Max Fleischer personally claimed the renewal copyright in the work *Betty Boop and Her Gang*, stating that he claimed the renewal as the author. Pl's Stmt. of Genuine Issues ¶ 24. Defendants maintain that this renewal was invalid and deny that Max Fleischer was the original author because he was not so identified on the original copyright registration for the work. Defs' Stmt of Genuine Issues ¶ 35.

9. With a renewal registration dated June 25, 1959, Max Fleischer personally claimed the renewal copyright in the work *Betty, Cartoon Character*, stating that he claimed the renewal as the author. The parties do not dispute that the renewal form certifying the correctness of the statements contained therein is not signed. Pl's Stmt. of Genuine Issues ¶ 23. Defendants maintain that this renewal was invalid and deny that Max Fleischer was the original author because he was not so identified on the original copyright registration for the work. Defs' Stmt of Genuine Issues ¶ 35.

10. Defendants' maintain that the purported transfer to CBS is irrelevant "because the character was already in the public domain." Defs' Stmt of Genuine Issues ¶ 34.

## F. DEFENDANTS' ALLEGED INFRINGEMENT

The parties do not dispute that there have been approximately 200 Betty Boop licenses over the past five years, and authorized Betty Boop merchandise is widely sold in retail stores and over the Internet. Defs' Stmt. of Genuine Issues ¶¶ 8–9. The merchandise has been sold with labels depicting the name and image of Betty Boop and with text identifying Fleischer Studios as the copyright and trademark owner of the character. *Id.* at ¶ 10. The United States Patent and Trademark Office has granted Plaintiff (the current FSI) four federal trademark registrations in the name Betty Boop for a wide array of merchandise. Fleischer Decl. ¶ 27, Ex. 40.

On or before 2002, Defendants obtained a number of publicity movie posters featuring Betty Boop. The posters were originally created between 1931 and 1939. Defendants, who contend that these posters have fallen into the public domain, filed with the Copyright Office three Betty Boop registrations based on five such newly restored Betty Boop posters. They then began selling copies of and licensing rights in the restored Betty Boop movie poster artwork. Defendants' licenses to third parties permit the production and distribution of merchandise utilizing all or part of the Betty Boop movie poster images; the merchandise includes figurines, dolls, and T-shirts. Defendants do not dispute that they license to third parties rights to produce the same kind of Betty Boop merchandise that Plaintiff licenses to others. Defs' Stmt. of Genuine Issues ¶ 65.

## G. THE INSTANT LITIGATION

On September 29, 2006, Plaintiff filed the instant action, contending that Defendants violated its copyright and trademark rights in the Betty Boop character, and seeking an order permanently enjoining them from continuing to exploit the Betty Boop image.

With its Motion, Plaintiff seeks summary judgment on its copyright infringement claim, invalidation of Defendants' trademark registrations, and a permanent injunction. At the same time, Defendants seek summary judgment in their favor and the dismissal of all of Plaintiff's claims against them.

## III. APPLICABLE LEGAL STANDARD

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *See id.; see also Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1106 (9th Cir.2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its burden of persuasion at trial."). If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a

genuine issue for trial." Fed.R.Civ.P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987); *see also Long v. County of Los Angeles,* 442 F.3d 1178, 1185 (9th Cir.2006) ("Material facts are those which may affect the outcome of the case.") (internal citations omitted). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *T.W. Elec. Serv.,* 809 F.2d at 630–31; *see also Brookside Assocs. v. Rifkin,* 49 F.3d 490, 492–93 (9th Cir.1995). The evidence presented by the parties must be admissible. Fed.R.Civ.P. 56(e)(1). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford,* 877 F.2d 728, 731 (9th Cir.1989).

## IV. DISCUSSION

Defendants begin with the contention that Plaintiff's trademark claims must fail because the copyright in the Betty Boop character has lapsed, injecting the character into the public domain; thus, according to Defendants, Plaintiff should not be permitted to revert to trademark claims when its purported copyright interest has lapsed. The Court begins its analysis with the validity of Plaintiff's copyright claim.

### A. COPYRIGHT INFRINGEMENT

Ownership of the copyright, if any, in the Betty Boop character is the threshold matter in this litigation. *CDN Inc. v. Kapes,* 197 F.3d 1256, 1258 (9th Cir.1999) ("To make out a claim for copyright infringement, a plaintiff must show: (1) ownership of a valid copyright and (2) copying

by the defendant of protectable elements of the work."). Neither party points to evidence of a separate or independent copyright registration for the Betty Boop character. Rather, the parties focus on the validity of the rights in various *works* in which the character appeared in the early 1930s.

■ Generally, literary characters are entitled to somewhat limited copyright protection; however, far greater protection has been afforded cartoon characters. As early as 1954, the court in *Warner Bros. Pictures v. Columbia Broadcasting System,* 216 F.2d 945 (9th Cir.1954), while acknowledging that it was difficult to delineate a literary character, observed that when the author added visual imagery, the difficulty was reduced. Because a cartoon character has physical as well as conceptual qualities, it is more readily suitable than literary characters for copyright protection. *See Sid & Marty Krofft Television Prods., Inc. v. McDonalds Corp.,* 562 F.2d 1157, 1169 (9th Cir.1977); *see also* Leslie A. Kurtz, *The Independent Legal Lives of Fictional Characters,* 1986 Wis. L. Rev. 429, 440; Gregory S. Schienke, *The Spawn of Learned Hand–A Reexamination of Copyright Protection and Fictional Characters: How Distinctly Delineated Must the Story be Told?,* 9 Marq. Intell. Prop. L. Rev. 4 (2005).

■ Significantly, in 1978, the Ninth Circuit cited *Fleischer Studios v. Freundlich,* 73 F.2d 276 (2d Cir.1934), for the proposition that comic strip characters may be protected under the Copyright Act. *Walt Disney Prods. v. Air Pirates,* 581 F.2d 751, 754 (9th Cir.1978). The protection, if any, afforded the character is as a component part of a protected work. *Id.* ("The fact that its characters are not the separate subject of a copyright does not preclude their protection, however, because Section 3 of the then Copyright Act provided that Disney's copyrights included

protection for 'all the copyrightable component parts of the work copyrighted.' " (internal citations omitted)); *see also Silverman v. CBS Inc.*, 632 F.Supp. 1344, 1354 (S.D.N.Y.1986) ("Under section 3 of the 1909 Act, copyright protection encompasses 'all copyrightable component parts' of an author's work.").[11]

Accordingly, the Court first considers when the Betty Boop character became protected as a component part of a copyrighted work and whether that protection endures. If a separately protectable right in the character still exists, the Court will consider whether Plaintiff has established, by uncontroverted evidence, ownership of that copyright interest.

### 1. Protection for Character as a Component Part of a Protected Work

■ As noted above, while most literary characters may not ordinarily be amenable to copyright protection, cartoon characters may be afforded copyright protection. *Compare Air Pirates*, 581 F.2d at 755 (finding copyright protection available for a comic book character "which has physical as well as conceptual qualities[,]" and recognizing that "comic book characters ... are distinguishable from literary characters"); *and Silverman*, 632 F.Supp. at 1355("Cartoons, and other graphic representations of characters, have been afforded greater copyright protection than char-

acters described only by words."); *with Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266 (11th Cir.2001) (explaining regarding literary characters that "[a]t one end of the spectrum, *scenes a faire*—the stock scenes and hackneyed character types that "naturally flow from a common theme"—are considered "ideas," and therefore are not copyrightable. But as plots become more intricately detailed and characters become more idiosyncratic, they at some point cross the line into "expression" and are protected by copyright" (internal citations omitted)). "Characters that have received copyright protection have displayed consistent, widely identifiable traits." *See, e.g., Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1175–76 (9th Cir.2003) (finding magician "dressed in standard magician garb-black tuxedo with tails, a white tuxedo shirt, a black bow tie, and a black cape with red lining-and [whose] role is limited to performing and revealing the magic tricks" in a video: (a) was not an "especially distinct" (sufficiently delineated) character to warrant copyright protection, and (b) did not warrant character protection as "the story being told" because he was "merely a 'chessman in the game of telling the story [and] he is not within the area of the protection afforded by the copyright' " (quoting *Warner Bros. Pictures v. Columbia Broadcasting System*, 216 F.2d 945, 950 (9th Cir.1954))).[12]

---

11. The parties agree that the Copyright Act of 1909 the ("1909 Act") applies to the copyrights at issue in this litigation.

12. As the District Court explained it in the course of granting summary judgment for the defendant in *Rice*, the magician in the video was not protectable as a character:

 There are, it seems, essentially two tests for copyrightability of a "character" apart from the copyrighted work in which he or she (or it) appears. The character must either be "the story being told" or, for visually depicted characters, be "sufficiently delineated" or

fleshed out to warrant separate protection. *See Toho [Co., Ltd. v. William Morrow and Co., Inc.*, 33 F.Supp.2d 1206, 1215–16 (C.D.Cal.1998)]; *Metro–Goldwyn–Mayer[, Inc. v. Am. Honda Motor Co., Inc.*, 900 F.Supp. 1287, 1295–96 (C.D.Cal.1995)]. However, this requires significant development of the character. "[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." *Olson [v. Nat'l Broadcasting Co., Inc.*, 855 F.2d 1446, 1452 (9th Cir.1988)] (alteration in original) (citation omitted). Here, Plaintiff cannot satisfy either test for the Mystery Magician.

Here, the question of when Betty Boop became a protectable element within a particular work depends "solely on a comparison of the works in issue rather than on the credibility of witnesses or other evidence only for the factfinder." *Cf. Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 918 (2d Cir.1980) (explaining that it was proper for district court judge to rule on issue of substantial similarity because, "[a]lthough the issue of substantial similarity is clearly a factual one," ... "where both the plaintiff's and defendant's works are before the court, the court may compare the two works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity." (internal quotations and citations omitted)); *Harvey Cartoons v. Columbia Pictures Industries, Inc.,* 645 F.Supp. 1564, 1570–71 (S.D.N.Y.1986) ("The power of a court to grant summary judgment dismissing copyright infringement claims is appropriate where, as here, the parties are able to put their work before the court in concrete form, thus facilitating a comparison of the works. The court may then determine noninfringement as a matter of law, either because the similarity between the two works concerns only non-copyrightable elements of the plaintiff's work, or because

---

First of all, though perhaps not an explicit requirement, cases finding copyrightable characters have typically seemed to implicitly require that the characters appear several times, in different books, movies, or other presentations, and that their attributes have been *consistently* portrayed in those various appearances. *See, e.g., Toho,* 33 F.Supp.2d at 1216 ("In this case, Godzilla has likewise developed a constant set of traits that distinguish him/her/it from other ... characters."); *Metro–Goldwyn–Mayer,* 900 F.Supp. at 1296 ("[B]ecause many actors can play Bond is a testament to the fact that Bond is a unique character whose specific qualities remain constant despite the change in actors."). This is consistent with the requirement that a protectable character comprise "the story being told," and/or be so highly "delineated," in that the crucial question is whether what is important is the character itself, or the story in which it appears. *See Metro–Goldwyn–Mayer,* 900 F.Supp. at 1296 ("Indeed, audiences do not watch Tarzan, Superman, Sherlock Holmes, or James Bond for the story, they watch these films to see their heroes at work."). That the Mystery Magician has appeared in only one presentation, which was not even widely distributed to the public, belies Plaintiff's claim that this "character" should itself be subject to protection.

Secondly, the Mystery Magician is not "the story being told" in the Rice Video, nor is his "character" highly "delineated" therein. Plaintiff's attempts to paint the Rice Video as the heroic tale of a magician defying the "magic community" for the altruistic purpose of inspiring renewed interest in magic not-withstanding, it is clear that the "story" of the Rice Video is the actual revelation of the tricks. Indeed, the "character" of the Mystery Magician is not "fleshed out" at all. He is kept intentionally anonymous, and is quite replaceable.

The Mystery Magician is more notable for its very absence of any "character" traits than for the presence thereof. Aside from those times when the Mystery Magician speaks (through voice-over), and/or whatever clues might be picked up from his movement, demeanor, and the appearance(s) of his assistants, he is essentially without identity, and is merely a non-specific "magician" character in the classic garb (tuxedo, white shirt, and tails) of that profession. If the character of Sam Spade in "The Maltese Falcon" may not be protected by copyright apart from the tale in which he appears, as the Ninth Circuit found nearly fifty years ago, in *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.,* 216 F.2d 945, 950 (9th Cir.1954), without question the Mystery Magician "character," which has (as yet) appeared in only a single, meagerly-distributed, video on the secrets of magic, and whose "character" is notable more for its lack of "delineation" than for its clear demarcation, does not create a basis for copyright protection separable from that afforded to the Rice Video itself.
*Rice v. Fox Broadcasting Co.,* 148 F.Supp.2d 1029, 1055–57 (C.D.Cal.2001), *aff'd on point, rev'd on other grounds,* 330 F.3d 1170, 1175 (9th Cir.2003).

no reasonable jury, properly instructed, could find that the two works are substantially similar." (internal quotations and citations omitted)). Accordingly, the Court will decide the issue in the context of these cross motions for summary judgment.

■ Plaintiff argues that Betty Boop's attributes were not "fixed" until 1932, and maintains that FSI owns character rights in Betty Boop based on *all* of the more than 30 original cartoon films and booklets in which the character was developed. However, the Court looks to when the character "displayed consistent, widely identifiable traits." That occurred perhaps as early as August 9, 1930, when the *Dizzy Dishes* cartoon movie was copyrighted by Paramount, but not later than May 23, 1931, when the *Silly Scandals* cartoon was copyrighted by Paramount. In any event, although the character was not first called "Betty Boop" until the *Minding the Baby* cartoon film, copyrighted on September 26, 1931, and earrings did not replace her dog ears until the *Mask–a–Raid* cartoon film, copyrighted on November 7, 1931, the "specific qualities" that constitute Betty Boop were sufficiently fixed prior to the July 1, 1931 copyrighting of the *Betty, Cartoon Character* booklet. Stated otherwise, her "attributes [were] consistently portrayed in those various appearances." [13] *Rice,* 148 F.Supp.2d at 1056 (emphasis in original).

The character in *Dizzy Dishes* and the "Betty" in *Silly Scandals* share the recognizable head, face, hair, and figure of Betty Boop. *Cf. Harvey Cartoons,* 645 F.Supp. at

1570 (" 'Fatso's' most distinctive feature, his basic top-knotted design, has not changed to any appreciable degree since 1955. From 1955 until Harvey ceased publishing, 'Fatso' retained the same jowly cheeks and the same billowy contour.... The only appreciable 'original contribution' made to 'Fatso' in Harvey's derivative works is new storyline."). Accordingly, Betty Boop, the cartoon character, was a protectable component part of the cartoon films that were copyrighted prior to July 1931.

## 2. Maintenance of Protection

Defendants advance a variety of arguments for the proposition that the Betty Boop character entered the public domain.

Under the 1909 Act, a work could enter the public domain if: (1) the requirements of the statute, including those for renewal, were not satisfied, *Harvey Cartoons v. Columbia Pictures Industries, Inc.,* 645 F.Supp. 1564, 1569 (S.D.N.Y., 1986) (explaining that, under Section 23 of the 1909 Act, "expiration of the original twenty-eight year period and failure to renew the copyright caused the work to enter the public domain."); or (2) if the work was published without a copyright notice. *See, e.g., Twin Books Corp. v. Walt Disney Co.,* 83 F.3d 1162, 1166 (9th Cir.1996) ("Under [the general rule under the 1909 Act], a publication of a work in the United States without the statutory notice of copyright fell into the public domain, precluding forever any subsequent copyright protection of the published work.").

**13.** According to Plaintiff, Betty Boop appeared in three cartoon films that were copyrighted by Paramount between the time that *Dizzy Dishes* was copyrighted in August 1930, and *Silly Scandals* was copyrighted in May 1931. Those are: *Barnacle Bill,* copyrighted August 31, 1930; *Mysterious Mose,* copyrighted December 26, 1930; and *The Bum Bandit,* copyrighted April 3, 1931. Handman Decl. ¶ 17, Ex. 15 (chart Handman attests: (a)

identifies "all known 'Betty Boop' related cartoons produced from 1930 to 1932"; (b) was prepared based on information from Copyright Office records; and (c) "truly and accurately summarizes initial and renewal copyright registration information from those records for those works"). Defendants do not object to the admissibility of Handman's statements or the exhibit.

Here, the Betty Boop character did not enter the public domain for failure to timely to renew the works, the earliest cartoon films, in which the original character rights arose. The August 9, 1930 copyright of *Dizzy Dishes* was timely renewed by UM & M on August 30, 1957. The May 23, 1931 copyright of *Silly Scandals* was timely renewed by UM & M on August 30, 1958.[14] Similarly, whenever the Talkartoon poster appeared without a copyright notice, neither party submits evidence that it was prior to August 1931. The Talkartoon poster did not constitute the "basic pictorial representation" or "underlying work" of the original Betty Boop character. *See Harvey Cartoons v. Columbia Pictures Industries, Inc.*, 645 F.Supp. 1564, 1569–70 (S.D.N.Y.1986) (explaining that, where "the underlying work" containing the "predecessor character" is in the public domain, "the copyright on the derivative work will not protect the underlying work" and stating that "if copyright protection for the basic pictorial representation of [character] had lapsed prior to [defendant]'s first publication of the [allegedly infringing] logo, then [plaintiff]'s copyright infringement claim must fail as a matter of law"); *see also Silverman v. CBS Inc.*, 632 F.Supp. 1344, 1353 (S.D.N.Y.1986) ("Under the 1909 Act, publication without copyright notice resulted in loss of copyright protection, which could not be restored by subsequent registration."). Thus, even if the poster did fall into the public domain as a result of the lack of a copyright notice,[15] the original Betty Boop character that is a component part of the pre–July–1931 cartoon films did not. *Russell v. Price*, 612 F.2d 1123, 1128 (9th Cir.1979) ("[A]lthough the derivative work may enter the public domain, the matter contained therein which derives from a work still covered by statutory copyright is not dedicated to the public. The established doctrine prevents unauthorized copying or other infringing use of the underlying work or any part of that work contained in the derivative product so long as the underlying work itself remains copyrighted." (internal citations omitted)).

Accordingly, if UM & M's renewals were proper and valid, the Betty Boop character remains protected by virtue of UM & M's renewal of the rights in the early cartoon films of which the character was a component part.

### 3. Chain of Title for Character as Component Part of Pre–July–1931 Cartoon Films

■ Plaintiff concedes that it has no ownership in the copyrights for the cartoon films that were transferred to Paramount in 1941. Rather, Plaintiff contends that the character rights it seeks to protect exist by virtue of the character's development in the more than 30 films and booklets created in the 1930s.[16] As the

---

14. Defendants also argue that "some" of the cartoon films in which the Betty Boop character appeared were not properly renewed and, as a result, fell into the public domain. However, Defendants point to no evidence that any of the cartoon films created and copyrighted in the period between *Dizzy Dishes*, copyrighted August 9, 1930, and *Silly Scandals*, copyrighted May 21, 1931,—the cartoon films identified *supra* in footnote 13—were not properly renewed or otherwise fell into the public domain.

15. The Court is not persuaded that the display of the Talkartoon posters constituted publication that would have injected the work into

the public domain. *See Silverman*, 632 F.Supp. at 1353–54 (explaining that neither the exhibition of a work to the public (general publication) nor the distribution of tangible copies of a work to a limited class of persons for a limited purpose (limited publication) injected a work into the public domain).

16. At oral argument, Plaintiff also argued that the current state of the law is such that the copyright in a character is developed in the first work that creates the character. Plaintiff maintains that the first such work was Silly Scandals, copyrighted in 1931.

foregoing discussion demonstrates, the Court does not find this reasoning persuasive.

Additionally, the decision in *Toho* does not fortify Plaintiff's position; *Toho* is distinguishable. The plaintiff in *Toho* demonstrated *prima facie* ownership of the copyrights in the films in which the character at issue in that case, Godzilla, was a component part. Thus, because Godzilla "is a well-defined character with highly delineated consistent traits[,]" the Court concluded that the plaintiff had also "demonstrated prima facie ownership of copyrights in the Godzilla character apart from any film." *Toho Co., Ltd. v. William Morrow and Co., Inc.,* 33 F.Supp.2d 1206, 1216 (C.D.Cal.1998). Here, Plaintiff points to no copyright registrations identifying Max Fleischer, the original FSI, or Plaintiff as the author or registrant of any of the pre–July–1931 cartoon films in which the original Betty Boop appeared and was a protectable component part. *Rohauer v. Friedman,* 306 F.2d 933, 935 (9th Cir.1962) ("The introduction into evidence of a copyright Certificate of Registration creates a prima facie case as to the facts stated therein. The burden then shifts to the other party to go forward with the evidence in order to overcome such prima facie case."). It follows that Plaintiff's "chain of title" arguments involving transfers by Max Fleischer and/or his heirs cannot result in a vesting of those character rights (the rights in the original—as opposed to a derivative—character) in Plaintiff. Plaintiff has not pointed to competent evidence that would establish that Max Fleischer and his heirs had any such rights to transfer.

All of Plaintiff's remaining chain-of-title arguments rely on "acknowledgments" of rights by third parties who came into rights by virtue of an initial purported transfer of rights from Paramount, *e.g.,* UM & M in 1955, Harvey in 1958, CBS in 1980. All but the Paramount–UM & M chain fail because they involve transfers of rights in works other than the pre–July–1931 cartoon films.

All the cartoon films after *Dizzy Dishes* and Silly Scandals, as well as all the booklets at issue in this litigation, are derivative works. *See Micro Star v. Formgen Inc.,* 154 F.3d 1107, 1110 (9th Cir.1998) ("[A] derivative work must exist in a concrete or permanent form ... and must substantially incorporate protected material from the preexisting work" (internal quotations and citations omitted)); *see also Russell,* 612 F.2d at 1128 (explaining that, under the 1909 Act, it was "the well-established doctrine that a derivative copyright protects only the new material contained in the derivative work, not the matter derived from the underlying work."). Accordingly, the relevant chain of title here is the one whereby Paramount assigned rights to UM & M. The other chains of title involve transfers of rights in works created and copyrighted after *Dizzy Dishes* and *Silly Scandals:* derivative works containing derivative Betty Boop characters.

#### a. Chain to UM & M

The language of the 1941 Cartoon Film Agreement, which was signed by Max Fleischer for the original FSI, is very broad. It assigns to Paramount all characters in all cartoons, all copyrights and renewal and extension rights. Under the terms of that assignment, and as the proprietor of the rights, Paramount had the right to apply for the renewals in *Dizzy Dishes* and *Silly Scandals.*

■ In 1958, Paramount assigned the rights in the cartoon films to UM & M. At oral argument, Defendants contended that, because the assignment to UM & M did not mention renewal rights, the renewal rights were not transferred to UM & M, making the UM & M renewals in 1958

invalid. The Court disagrees. *Rohauer v. Friedman*, 306 F.2d 933, 936 (9th Cir.1962) ("The language of the agreement in general, as well as the circumstances surrounding its execution may also serve to indicate the intent of the parties. And where there is evidence which shows an intention to transfer the renewal rights, the fact that they were not expressly mentioned in the assignment of the original copyright will not preclude their passing with the copyright.").

Here, the assignment to UM & M provides for the transfer of all the rights in the cartoon films "and any copyrights subsisting therein." This all-inclusive language evinces an intent to transfer both the original copyright and the renewal rights the copyrighted works. Moreover, there is no evidence that would tend to support a finding that Paramount intended to retain any right to or interest in the renewal rights for the works.[17] *Id.* (finding same on the basis of similar contractual language and record). Accordingly, the Court concludes that UM & M received a valid right to renew the copyrights in the cartoon films and, by extension, in the rights in the characters subsisting within those cartoon films covered by the assignment. *Cf. Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 659, 63 S.Ct. 773, 780, 87 L.Ed. 1055 (1943) (explaining that, "before and after the Copyright Act of 1909[,]" an author's assignment of renewal rights executed prior to the vesting of such renewal right is binding). It follows that because UM & M was the legal owner of the renewal right, its renewal of the copyrights in the *Dizzy Dishes* and *Silly Scandals* cartoon films were valid. *See, e.g., Rose v. Bourne, Inc.*, 279 F.2d 79, 81 (2d Cir.1960) ("[T]his court has repeatedly held that a power of attorney to apply for renewal rights will be implied from the fact of the assignment."); *see also Rossiter v. Vogel*, 134 F.2d 908, 911 (2d Cir.1943) ("It is well established ... that a power of attorney will be implied from the mere fact of an assignment."). Thus, the question becomes whether Plaintiff can demonstrate that no genuine issue of material fact exists re-

---

**17.** The Court notes with interest that the Paramount–UM & M Agreement also contained the following language, which appears to purport to reserve to Paramount the rights to the characters subsisting within the cartoon films covered by the assignment:

Except for the literary material referred to in Subparagraph (b) of this Paragraph 4, no grant or assignment is made hereunder of any other material contained in said Sold Photoplays [subject of agreement]. Without limiting the generality of the foregoing, the term "other material" as used herein shall be deemed to include, without limitation, any and all songs and other music material and lyrics. All right, title and interest of Paramount in and to such other material shall remain exclusively vested in Paramount, but Paramount hereby grants to Purchaser, to such extent as Paramount may have the same, a non-exclusive license to use such other material only as part of the particular Sold Photoplay ... *Anything to the contrary notwith-*

*standing, no grant or assignment is made hereunder to the Purchaser of the characters and characterizations contained in said Sold Photoplays or said literary material, or of the copyrights in said characters or characterizations, or of any production or other rights in said characters and characterizations, or to use said characters and characterizations or the names of said characters* or trade names, trademarks and names of the series of Sold Photoplays or of said literary material in any manner except ...
Pl's Ex. 14 at FS00532 (paragraph 4(I) of the Paramount–UM & M Agreement) (emphasis added). However, neither party advances arguments regarding: (a) the effect, if any, of this language on the grant of renewal rights in the works; or (b) whether rights in component parts of protected works are severable in this manner; how such rights, if severable, would remain protected by copyright; or how such severed rights, if separately protectable, are effectively retained or transferred.

garding the chain of title from UM & M to Plaintiff.

### b. *Chain from UM & M to Plaintiff*

Plaintiff maintains that it came to own UM & M's rights by virtue of a 1979 letter from National Telefilms Associates ("NTA") to the parent of FSI NY2's licensing agent and a 1997 settlement agreement entered into by Plaintiff and Republic Pictures ("Republic"). Plaintiff's evidence of the relationships between UM & M, NTA, and Republic consists of the following statements in the Handman Declaration:

> After it acquired Fleischer Studios' Betty Boop cartoons, UM & M was acquired by a company called National Telefilm Associates ("NTA") in about 1958. I dealt with NTA concerning Betty Boop on many occasions over the years. NTA renamed itself Republic Pictures ("Republic") in about 1986 (NTA's renaming is referenced in Copyright Office Records. *See* Exhibit 6, p. 10.). As Republic, it continues to distribute Fleischer Studios' Betty Boop cartoons at present.

Handman Decl. ¶ 18.

Defendants object: (a) to Handman's statements on the grounds that Handman lacks personal knowledge of the NTA acquisition and the renaming of the company as Republic, and (b) to the "research report" included as Exhibit 6 as inadmissible hearsay.

Plaintiff counters that Handman's sworn statement is based on his personal knowledge, acquired through personal dealings with NTA concerning Betty Boop. Plaintiff also cites *Fleischer v. AAP*, 222 F.Supp. 40 (S.D.N.Y.1963), as evidence of a court recognizing UM & M as a predecessor to NTA. However, Plaintiff provides no pinpoint citation for the portion of the case that would support this assertion. The Court has reviewed the cited opinion and found no such recognition. The Court sustains Defendants' objections to Handman's

statements because Plaintiff has not introduced evidence sufficient to support a finding that he has personal knowledge of the purported corporate restructurings of UM & M/NTA/Republic. Fed.R.Evid. 602.

As for the admissibility of Exhibit 6, Plaintiff counters that the research report, a "character search" conducted for Pathe Entertainment, is a compilation of public records or that it is a compilation of public records that are self-authenticating and which are admissible hearsay under Federal Rule of Evidence 803(8). The Court has examined the document. It appears to have been prepared by "Copyright Research Group" and bears the following disclaimer on the cover page: "We have taken all reasonable steps to ensure the completeness and accuracy of this report; however, due to the highly subjective nature of copyright and title searching we cannot otherwise guarantee results. This search is valid only for the property or title noted above [Betty Boop]. If the property or title which was the subject of this search is changed, even slightly, a new search would be conducted. Please note that this report in no way constitutes a legal opinion." Handman Decl., Ex. 6 at FS00001. There is no indication that it is a copy of an official record or report or otherwise admissible under Federal Rule of Evidence 902(4) or that it is a report or data compilation of a public office or agency that would be admissible under Rule 803(8). Further, Plaintiff has not established the report's admissibility under Rules 803(15) (concerning "statements in documents affecting an interest in property"), 803(16) (concerning "statements in ancient documents"), or 1006 (concerning summaries of voluminous records for which "originals or duplicates shall be made available for examination ... by other parties"). Accordingly, the Court sustains Defendants' objections to Exhibit 6 of the Handman Declaration for the

purpose of establishing the corporate relationship(s) between UM & M, NTA, and Republic.

However, even if the Court were to consider Handman's statements and Exhibit 6 as evidence on this point (because, although the original version of the underlying documents are not available, they are not closely related to a controlling issue in this case), bridging this apparent break in the chain of title would not alter the outcome here. Accordingly, the Court continues to examine the remaining links in the purported chain that Plaintiff contends leads to FSI NY2 and Plaintiff.

■ Neither NTA's 1979 letter to the Office of General Counsel for the Hearst Corporation, which is the parent to Plaintiff's (formerly FSI NY2's) licensing agent nor Republic's 1997 settlement agreement with Plaintiff constitutes evidence of a transfer of rights in the relevant cartoon films or, specifically, of the original character rights that subsist in *Dizzy Dishes* and *Silly Scandals*. The 1979 letter to Hearst Corporation includes NTA's acknowledgment that it "neither own[s] nor control[s] the merchandising rights to the 'Betty Boop' character" and goes on to state:

> To the best of our knowledge and belief, the merchandising rights are owned and controlled by the estate of Mr. Max Fleischer, which is administered by his son ..., further, that these rights are under license by them to King Features Merchandising. We have no knowledge whether this is a division of yours.

Handman Decl., Ex. 17. The settlement agreement that came about as a result of a suit Republic filed against Plaintiff in 1997 provides that Republic "has and continues to claim that it is the exclusive owner of the copyrights throughout the world in an existing series of animated cartoons which feature Betty Boop ('Republic's Betty Boop Cartoons')" and that Plaintiff "has

and continues to claim that it is the exclusive owner of the copyrights throughout the world in the character known as Betty Boop ('FSI's Betty Boop'), including but not limited to the renewal copyrights in 'Betty, Cartoon Character,' No. R:241400 and 'Betty Boop and Her Gang,' Nos. R:247925 and R:258317." Handman Decl. ¶ 20, Ex. 18 at FS00430. The settlement agreement goes on to recognize Republic's right to the cartoon films and states:

> Except as otherwise set forth herein, all other rights in the character Betty Boop are reserved in and to FSI, including but not limited to rights in: worldwide motion picture, television, video, video discs, live stage and any and all similar rights whether now known or hereafter devised, hereinafter collectively referred to as the 'Motion Picture and Television Rights,' as well as all subsidiary and ancillary rights therein and thereto, including, without limitation all remakes, sequel, merchandising, print and music publishing, ... in FSI's Betty Boop, all of which rights are reserved exclusively to FSI.

Handman Decl., Ex. 18 at FS00432.

Neither NTA's 1972 acknowledgment in a letter nor the 1997 settlement agreement between Republic and Plaintiff effected a transfer of rights that are good as against the world. At most, these documents evidence the parties' recognition of rights effective only between the parties. Moreover, neither party to the instant litigation has argued or established that the rights in the original character were or are severable from the works in which the original Betty Boop appears.

Accordingly, Plaintiff has not demonstrated a chain of title in the relevant cartoon films or the component parts thereof that leads to and terminates with Plaintiff. Stated otherwise, Plaintiff has not established its ownership of the Betty

Boop cartoon character. Accordingly, Plaintiffs' Motion for Summary Judgment and Permanent Injunction is DENIED with respect to Plaintiff's copyright infringement claim, and Defendants' Motion for Summary Judgment is GRANTED with regard to Plaintiff's copyright infringement claim.

## B. TRADEMARK AND UNFAIR COMPETITION CLAIMS

 Defendants oppose Plaintiff's Motion for Summary Judgment by contending that Plaintiff cannot prevail on its trademark claims because, once a copyright has expired, the right to copy the work passes to the public. Defendants are correct that, in *Dastar*, the Supreme Court cautioned against "misuse or over-extension of trademark and related protections into areas traditionally occupied by patent or copyright." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34, 123 S.Ct. 2041, 2048, 156 L.Ed.2d 18 (2003) (internal quotation marks omitted). As the Court explained:

> The right to copy, and to copy without attribution, once a copyright has expired, like "the right to make [an article whose patent has expired]-including the right to make it in precisely the shape it carried when patented-passes to the public." *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 230, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *see also Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 121–122, 59 S.Ct. 109, 83 L.Ed. 73 (1938). "In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). The rights of a patentee or copyright holder are part of a "carefully crafted bargain," *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150–151, 109 S.Ct. 971, 103 L.Ed.2d 118

(1989), under which, once the patent or copyright monopoly has expired, the public may use the invention or work at will and without attribution.

*Id.* at 33–34, 123 S.Ct. 2041. However, as the foregoing discussion of Plaintiff's copyright infringement claim demonstrates, the Court has not found that the Betty Boop character has fallen into the public domain. Accordingly, the Court considers trademark and unfair competition claims on the merits.

 "The Lanham Act confers standing on 'any person who believes that he is or is likely to be damaged' by another's use of a 'false designation of origin' on merchandise entering into commerce. 15 U.S.C. s 1125(a).... The crucial question is whether the prospective plaintiff has a reasonable interest that requires protection from the defendant's false representations." *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 526 F.Supp. 1187, 1193 (S.D.N.Y., 1981), *rev'd on other grounds*, 697 F.2d 27 (2d Cir.1982), *superseded by rule and statute on other grounds*. "To succeed on the merits, plaintiff must establish three elements: (1) that he owns the mark; (2) that the mark indicates the source of the recordings ("secondary meaning"); and (3) that defendant's use of the mark is likely to create confusion as to the source of the recordings." *Culliford v. CBS, Inc.*, 222 U.S.P.Q. 497, 499 (D.D.C. 1984); *see also Toho*, 33 F.Supp.2d at 1210 ("When trademark and unfair competition claims are based on the same infringing conduct, courts apply the same analysis to both claims. To succeed on a claim for trademark infringement or unfair competition, the moving party must establish: (1) ownership of the trademark at issue; (2) use by defendant, without authorization, of a copy, reproduction, counterfeit or colorable imitation of the moving party's mark in connection with the sale, distribution or

advertising of goods or services; and (3) that defendant's use of the mark is likely to cause confusion, or to cause mistake or to deceive." (internal quotations and citations omitted)).

Here, Plaintiff has established by uncontroverted evidence ownership of four registered marks for the *name* "Betty Boop." Handman Decl., Ex. 40. Further, Plaintiff contends that its trademark registrations are more than five years old, qualifying them for "incontestable" status under the Lanham Act. 15 U.S.C. § 1065; *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 196, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985) ("With respect to incontestable marks, however, § 33(b) provides that registration is conclusive evidence of the registrant's exclusive right to use the mark, subject to the conditions of § 15 and the seven defenses enumerated in § 33(b) itself."). Defendants present no argument or evidence to controvert Plaintiff's assertion of its marks' incontestable status. Similarly, Defendants do not dispute that they sell copies and licensing rights in the their copyrighted poster artwork to third parties to produce and distribute merchandise with the Betty Boop image, nor do Defendants dispute that they license to third parties rights to produce the same kind of Betty Boop merchandise that Plaintiff licenses to others. Defs' Stmt. of Genuine Issues ¶ 65. However, neither the argument nor the evidence before the Court makes clear whether Defendants' use and licensing of all, or portions of, the poster artwork for which it has valid copyright registrations infringe or otherwise impair Defendant's registered marks for the *name* "Betty Boop."

Plaintiff appears to be basing some or all of its trademark infringement claims on the use of images of the Betty Boop cartoon character. However, Plaintiff does not address how its registered trademarks encompass the use of the image of Betty Boop; nor does Plaintiff separately address the nature or source of its common law trademark rights, if any, in Betty Boop images. Among the other questions before the Court with these cross-motions for summary judgment are: (a) whether the products Defendants sell and the rights Defendants license to others constitute a use of one or more of the marks Plaintiff owns, and (b) whether Defendants' use is likely to create confusion as to the origin of the products. Plaintiff's evidence of its trademark registrations indicate protection for a "word mark" for "Betty Boop."

Accordingly, the Court reserves ruling on the parties cross-motions for summary judgment in connection with Plaintiff's trademark and unfair competition claims. In light of the Court's ruling on Plaintiff's copyright claim, the parties are ordered to file supplemental briefing, setting forth their arguments and analysis of Plaintiff's trademark and unfair competition claims, addressing, *inter alia*, whether genuine issues of material fact exist in connection with whether Defendants use and licensing of the movie poster artwork (or its component parts) constitute a use of one or more of Plaintiff's marks and whether that use and licensing is likely to create confusion as to the origin of the resulting products.

## V. CONCLUSION

Plaintiff's Motion for Summary Judgment and a Permanent Injunction (docket no. 48) is DENIED and Defendant's Motion for Summary Judgment (docket no. 53) is GRANTED with respect to Plaintiff's claim for copyright infringement (Claim 1). Plaintiff's claim for copyright infringement (Claim 1) is DISMISSED. The Court orders RESERVES RULING on the remaining aspects of the parties cross motions and hereby orders supplemental briefing regarding whether sum-

mary judgment is warranted on any of Plaintiff's remaining claims for federal trademark infringement and federal false designation of origin (Claims 2 and 3), state law trademark infringement and unfair competition (Claim 4), and state law deceptive trade practices (Claim 5). Simultaneous briefing is ordered as follows: opening briefs are due not later than 30 days from the date of this order, and responsive briefs are due not later than 30 days thereafter.

**IT IS SO ORDERED.**