**FLEISCHER STUDIOS,**
**INC., Plaintiff(s),**

v.

**A.V.E.L.A. INC.; Art–Nostalgia.Com, Inc.; X One X Movie Archive, Inc.; Beverly Hills Teddy Bear Co.; Leo Valencia, Defendant(s).**

**Case No. 2:06–cv–06229–FMC–MANx.**

United States District Court,
C.D. California.

June 29, 2009.

Borchien Lai, Mark Steven Lee, Manatt Phelps and Phillips, Los Angeles, CA, for Plaintiff(s).

Douglas D. Winter, The Ball Law Firm LLP, James E. Doroshow, Fox Rothschild LLP, Los Angeles, CA, Anthony M. Keats, Keats McFarland & Wilson LLP, Beverly Hills, CA, for Defendant(s).

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON TRADEMARK AND UNFAIR COMPETITION CLAIMS AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON TRADEMARK AND UNFAIR COMPETITION CLAIMS

FLORENCE–MARIE COOPER, District Judge.

The matter is before the Court on Plaintiff's Motion for Summary Judgment (docket no. 48) and Defendants' Motion for Summary Judgment (docket no. 53), a portion of which the Court decided with its December 16, 2008, 772 F.Supp.2d 1135, 2008 WL 8236986 (C.D.Cal.2008), Order Re Plaintiff's Motion for Summary Judgment and a Permanent Injunction and De-

fendant's Motion for Summary Judgment ("Dec. 16, 2008 Order"). The Court has read and considered the parties' moving, opposing, and reply documents, as well as the supplemental briefing ordered by the Court regarding Plaintiff's trademark and unfair competition claims. The Court deems the matter appropriate for decision without further oral argument. *See* Fed. R.Civ.P. 78; Local Rule 7–15. For the reasons and in the manner set forth below, Plaintiff's Motion with respect to Plaintiff's trademark and unfair competition claims is DENIED; and Defendant's Motion is GRANTED on those claims.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This action arises out of a dispute over the ownership of intellectual property rights in Betty Boop, a cartoon character that has appeared in cartoon films and other media since the early 1930s. The parties do not dispute that Betty Boop represents a "highly profitable merchandising property[,]" or that "[t]here [have] been about 200 authorized U.S. Betty Boop licensees over the past five years, and merchandise sold under [Plaintiff's] Betty Boop trademarks has generated millions of dollars in gross sales" over many years. Pl's Stmt. of Uncontroverted Facts ("Pl's SUF") ¶ 8. Similarly, the parties do not dispute that the merchandise Plaintiff has sold since 1972 "has been sold with labels depicting the name and image of Betty Boop, and with text that identifies Fleischer Studios as the copyright and trademark owner of the character." *Id.* at ¶ 11.

The Court laid out the factual background of this action in considerable detail in its December 16, 2008 Order. Therefore, the Court summarizes here only the history relevant to the determination of the parties' cross motions for summary adjudication of Plaintiff's trademark and unfair competition claims.

## A. PARTIES TO THIS ACTION

### 1. *Plaintiff: Fleischer Studios, Inc.*

The Plaintiff in this action, Fleischer Studios, Inc. ("Plaintiff" or "Fleischer"), a California corporation, identifies no legal relationship or connection to earlier corporations of the same name. However, because the rights Plaintiff seeks to assert in this action originated in those now-defunct corporations, the Court reviews their history here.

### a. *The Original FSI*

It is undisputed that the original Fleischer Studios, a New York corporation, was incorporated in 1929. The original Fleischer Studios, Inc. ("FSI NY1") was formed by Max Fleischer and others.[1] In or about 1938, a new Fleischer Studios, Inc., was formed by Max Fleischer and his brother, David "Dave" Fleischer, and was incorporated in Florida ("FSI FL"). In 1938, all the assets of FSI NY1 were distributed to FSI FL. On May 24, 1941, Paramount Pictures, Inc. ("Paramount") purchased all of the assets of the original FSI.[2] FSI FL was dissolved in 1946, and FSI or "Fleischer Studios, Inc." ceased to exist for more than 25 years. Betty Boop and many of the other characters of the original FSI continued to exist.

---

1. "During the period from 1929 to 1942, Dave and Max Fleischer and the Fleischer corporations produced hundreds of animated motion picture cartoons. The best known of such creations included 'Popeye,' 'Betty Boop,' 'Superman,' 'Screensongs' and several full-length animated motion picture cartoons. All of these cartoons were distributed by Paramount Pictures Corporation." *Fleischer v. A.A.P., Inc.,* 163 F.Supp. 548, 554 (S.D.N.Y. 1958).

2. For purposes of this Order, the Court refers to FSI NY1 and FSI FL, collectively, as "the original FSI."

With an agreement signed on May 24, 1941, between the original FSI and Paramount, the original FSI assigned to Paramount all of its assets, including all the rights in all cartoon films and all of the characters contained therein. Pl's Ex. 4; Defs' Ex. F. The provisions of the 1941 Cartoon Film Agreement[3] included that the original FSI transferred to Paramount "its successors and assigns ... each and every motion picture cartoon ... heretofore and hereafter produced by or for the Producer or any of its predecessors in interest and which have been or shall be released in the United States of America ... on or before August 31, 1941, including but not limited to all parts thereof, all cutouts not actually included therein, all characters contained therein or created or used therefor, all copyrights, copyright renewal and extension rights and renewed and extended copyrights therein and thereto...." Pl's Ex. 4 at FS00942 (emphasis added).[4]

On July 11, 1941, the original FSI assigned to Paramount all of its copyright and renewal interest in and to several drawings and books, including the two booklets of Betty Boop drawings: *Betty, Cartoon Character* and *Betty Boop and Her Gang*. The July 11, 1941 Booklet Agreement,[5] provides, in pertinent part, that the original FSI assigned to Paramount "all of [its] right, title and interest in and to the copyrights heretofore taken out by [original FSI] listed below, of which we are the proprietors." Winter Decl. in Opp'n to Pl's Mot., Ex. H at FS00064.

Beginning in the mid–1950s, Paramount entered into various agreements whereby it assigned rights in the Betty Boop works to various other entities, including a 1955 assignment of numerous cartoon films to UM & M TV Corp. ("UM & M"), Pl's Stmt. of Genuine Issues ¶ 19; a 1958 assignment to Harvey Films, Inc. ("Harvey") of 220 cartoon films and other short subjects, including the booklet *Betty Boop and Her Gang;* an a 1980 quitclaim to CBS, Inc. ("CBS") whatever Betty Boop character rights Paramount still possessed.[6]

---

3. For purposes of this Order, the Court refers to the May 24, 1941 Agreement as the "1941 Cartoon Film Agreement."

4. The 1941 Cartoon Film Agreement also states that the personal property transferred from FSI N.Y. to "Paramount, its successors and assigns, absolutely and forever" under the Agreement included personal property that the parties agreed:
    ... shall not be limited to all tangible and intangible personal property and accounts receivable ..., *all* patents, copyrights and *trademarks,* all patent, copyright and *trademark renewal and extension rights,* all *renewed and extended* patents, copyrights and *trademarks* (and Paramount shall also have the right to obtain and acquire such renewals and extensions and such renewed and extended patents, copyrights and trademarks in the name of the Producer [original FSI] and otherwise and the Producer shall also assign to Paramount, its successors and assigns, all such renewed and extended patents, copyrights and trademarks when the same shall come into existence) and all rights, licenses, privileges and property therein, thereunder and with respect thereto, ... all characters created for use in any and all motion picture cartoons, all stories, treatments, adaptations, continuities, scripts literary dramatic and other material whatsoever,
Handman Decl, Ex. 4 at FS00942. Neither party mentions the effect or import of this language in the 1941 Cartoon Film Agreement.

5. For purposes of this Order, the Court refers to the July 11, 1941 Agreement as the "1941 Booklet Agreement."

6. Paragraphs 27 and 28 of the Handman Declaration filed in support of Plaintiff's Motion reference attached exhibits as supporting assertions regarding rights transferred to and from CBS. For example, paragraph 27 of the Handman Declaration references Exhibit 25 as a copy of a short-form option agreement summarizing the terms of the long-form op-

### b. Plaintiff

More than 25 years after the original FSI ceased to exist, at some point prior to Max Fleischer's death in September 1972, Max Fleischer and his heirs formed a new Fleischer Studios, Inc. as a New York corporation ("FSI NY2"). In August 1972, the new Fleischer Studios, FSI NY2, authorized the King Features Syndicate Division of the Hearst Corporation ("King Features") to act as its exclusive licensing agent for Betty Boop merchandise. Fleischer Decl. ¶ 21. However, Plaintiff does not indicate and offers no evidence to establish the origin of the merchandising rights involved in its relationship with King Features.

Plaintiff in this action, Fleischer Studios, Inc., is a California corporation ("FSI CA" or "Plaintiff") that was incorporated in 1992, at which point FSI NY2 was "merged into" FSI CA.[7] Handman Decl. in Support of Pl's Reply ("Handman Reply Decl.") ¶ 4, Ex. 46.

### 2. Defendants

Defendants A.V.E.L.A. Inc. ("AVELA"); Art–Nostalgia.Com., Inc. ("Art Nostalgia"); X one X Movie Archive, Inc. ("X one X"); and Leo Valencia ("Valencia"), the President, CEO, sole officer, sole shareholder, and sole employee of the defendant corporations (collectively "Defendants")[8] license rights in images of Betty Boop and other fictional characters to third parties. Licensees of the Betty Boop images manufacture merchandise that includes or incorporates restored "vintage" Betty Boop publicity movie posters from the 1930s. Defendants contend that the movie posters at issue in this litigation were not deposited or registered with the copyright office. Valencia Decl. ¶ 9 (referencing copies of Betty Boop posters attached as Exhibit A, one of which Valencia states was published without a copyright notice and four that Valencia maintains had copyright notices but were not deposited or registered).

On December 2, 2002, Defendants obtained federal copyright registrations for two restored Betty Boop movie posters. Valencia Decl., Ex. C (registration nos. VA 1–309–437 and VA 1–309–347). Around or after that time, Defendants began selling copies of and licensing rights in the restored Betty Boop movie poster artwork. Defendants' licenses to third parties permit the production and distribution of merchandise utilizing all or part of the movie poster images. The merchandise

tion agreement that "CBS Entertainment, a division of CBS Inc. ("CBS") .... entered into ... with Fleischer Studios" in or about 1980. Handman Decl. ¶ 27. However, the document attached as Exhibit 25 states that it is an October 8, 1980 option agreement between Harvey Films/Harvey Famous Cartoons and CBS Theatrical Films. Handman Decl., Ex. 25. FSI NY2 is not mentioned anywhere in the agreement. Similarly, the Handman Declaration indicates that the document attached at Exhibit 27 is a copy of a 1986 agreement between CBS and Fleischer Studios by which "all Betty Boop rights [CBS] had acquired would return to Fleischer Studios if CBS did not produce a play by October 7, 1987." Handman Decl. ¶ 29. However, although Exhibit 27 is a copy of part of an agreement between CBS and FSI NY2, it is impossible to determine the meaning or import of the agreement without the August 21, 1980 agreement referenced therein as attached as Exhibit A. The referenced "Exhibit A" is not attached to the copy of the agreement submitted as Exhibit 27. Handman Decl, Ex. 27.

7. For purposes of this Order, the Court refers to the Court also refers to FSI NY2 and FSI CA, collectively, as "Plaintiff."

8. On February 28, 2008, pursuant to the relevant parties' stipulation, the Court entered a permanent injunction against, and ordered the dismissal of, Defendant Beverly Hills Teddy Bear Co. All other claims remained against the parties herein referred to as "Defendants."

includes figurines, dolls, and T-shirts. Defendants do not dispute that their licensees' Betty Boop merchandise is the same type of Betty Boop merchandise that Plaintiff licenses to others. However, Defendants assert that their licensing agreements do not permit their licensees "to use the restored movie poster artwork as a trademark, to identify the source of the merchandise." Valencia Decl. in Opp'n to Pl's Mot. ¶ 10 (stating same, but not attaching licensing agreements to substantiate the assertion). The images of licensed products submitted by Defendants illustrate that images on the packaging of their licensees' products include: (a) the entirety of the movie poster artwork, e.g., poster advertising "Paramount Talkartoon" and showing Betty Boop holding an umbrella and standing with three other cartoon characters; (b) only one or more discrete elements effectively "lifted" from within the poster artwork, e.g., Betty Boop holding an umbrella; or (c) both of the foregoing. *See* Valencia Decl., Exs. D and E.

## B. RELEVANT PROCEDURAL HISTORY

On September 29, 2006, Plaintiff initiated this action, asserting the following claims against Defendants: (1) copyright infringement, (2) trademark infringement, (3) false designation of origin under the Lanham Act, (4) state law trademark infringement and unfair competition, and (5) deceptive trade practices.

On March 19, 2008, Plaintiff filed its Motion for Summary Judgment as to Liability and a Permanent Injunction (docket no. 48). On the same date, Defendants filed their Motion for Summary Judgment.

### 1. Plaintiff's Motion

Plaintiff's argument regarding its trademark and unfair competition claims in its Motion for Summary Judgment is premised on its assertion of ownership of federally registered and common law trademarks in the "name and image" of Betty Boop. *See, e.g.,* Pl's Mot. at 1; *see also id.* at 10:13–15 ("Fleischer Studios must prove *only* that there has been a misleading description or representation concerning goods or service that affects interstate commerce to prevail on its trademark and unfair competition claims" (emphasis added)). Plaintiff maintains that Defendants' "use of [Plaintiffs'] Betty Boop copyrights and trademarks lessens the value of its 'Betty Boop' brand and those intellectual property rights" and "threatens to harm the goodwill associated with authorized merchandise, and weaken [Plaintiff's] Betty Boop marks." *Id.* at 9:25–10:3.

Related to this primary line of argument, Plaintiff asserts that "[t]he former Fleischer Studios began authorizing Betty Boop merchandise in the 1930s."[9] Pl's SUF ¶ 5. Making no mention of merchandising or trademark rights in the decades after the original FSI sold its assets to Paramount in 1941,[10] Plaintiff resumes its discussion of the sale of Betty Boop merchandise with evidence that, "[i]n August 1972, a reformed Fleischer Studios authorized the King Features Syndicate Division

---

9. The Court acknowledges this as argument not necessarily supported by admissible evidence.

10. The Fleischer Declaration states, without citation to any supporting evidence:
    The original Fleischer Studios sold its assets to Paramount in 1941. However, just before my grandfather passed away in 1972,

he reformed Fleischer Studios and entered into a new licensing agreement with the King Features Division of the Hearst Corporation for new Betty Boop merchandise. Fleischer Studios-authorized Betty Boop merchandise has been continuously offered to the public since that time.
Fleischer Decl. ¶ 21.

of the Hearst Corporation to act as its exclusive licensing agent for Betty Boop merchandise," and Plaintiff points to evidence that its authorized Betty Boop merchandise has been continuously offered to the public since the early 1970s. Pl's SUF ¶¶ 6 & 7; Fleischer Decl. ¶ 22, Ex. 35; Pl's Reply at 12:13–16 (citing authority for the argument that Betty Boop qualifies for trademark registration as the title to a series of works, pointing out that "Betty Boop was used to identify a series of cartoons in which she appeared[,]" then skipping to the assertion that "Betty Boop has been continuously used as a source identifier or 'title' for thousands of Betty Boop items of merchandise manufactured by hundreds of Fleischer Studios licensees for over 30 years").

Plaintiff asserts that it "possesses common law trademark rights in the images of Betty Boop used on merchandise or labels that accompany authorized merchandise." Pl's SUF ¶ 15. However, at most, the evidence Plaintiff references in support of this assertion substantiates that Plaintiff's *labels* indicate copyright and trademark rights in images of Betty Boop. *Id.* (citing Fleischer Decl., Ex. 39,[11] which consists of copies of what appear to be labels or packaging for products made or licensed by Plaintiff). Additionally, in a footnote, Plaintiff argues that its "trademark rights may be created and strengthened through use by licensees." Pl's Mot. at 13 n. 2 (citing authority for this proposition, but identifying no evidence of use by a licensee

that can be viewed as creating Plaintiff's trademark rights).

As evidence of its federal trademark registrations, Plaintiff submits records indicating four separate registrations of the "word mark" "Betty Boop" on a variety of merchandise. Fleischer Decl. ¶ 14, Ex. 40 (printout from the USPTO's website providing basic information about registration nos. 2430642, 2378474, 2374258, and 2392715 for "word mark" "Betty Boop").[12] The earliest "use date" indicated on the registrations—all of which were filed in 1998 and issued in 2000 and 2001—is 1981. Plaintiff also argues that those four federal trademark registrations "are now incontestable." Pl's Mot. at 13:19–20 (citing Pl's SUF ¶ 14, the printout from the USPTO website, which does not expressly identify the marks as incontestable).

### 2. *Defendants' Motion*

Moving for summary judgment in its favor on Plaintiff's trademark and unfair competition claims, Defendant's primary argument is that Plaintiff could not prevail because the Betty Boop posters it uses and licenses are copyrightable works that "were entirely in the public domain[,]" and, as a result, using trademark claims "to reclaim that which was previously protected by copyright" would run afoul of the Supreme Court's decision in *Dastar Corporation v. Twentieth Century Fox Film Corporation*, 539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003). Defs' Mot. at 22:13–15, 23:12–14. Defendant also ar-

---

11. Plaintiff's Statement of Uncontroverted Facts references Exhibit 38, but that appears to be a typographical error, as Exhibit 38 is of a website offering Betty Boop merchandise, and paragraph 28 of the Fleischer Declaration, in fact, references Exhibit 39 in support of this line of argument.

12. Plaintiff maintains that, as a result of its sale of Betty Boop merchandise, "the name

and likeness of Betty Boop possesses a valuable goodwill, and are well-known to the public as identifying products and services that are authorized by Fleischer studios and its exclusive licensing agent." Pl's SUF ¶ 13. However, Plaintiff identifies no admissible evidence in support of the legal conclusions contained in this assertion.

gued that Plaintiff could not prevail because it could not prove secondary meaning: "Plaintiff's mark 'Betty Boop' serves one purpose—to describe the image of Betty Boop that also appears on the products licensed by Plaintiff. The mark "Betty Boop" on the product does not evoke an association between the mark and a single source of the product." *Id.* at 24:24–27; *see also id.* at 25:2–16 (citing *Nancy Ann Storybook Dolls v. Dollcraft, Co.,* 197 F.2d 293, 296 (9th Cir.1952), a trademark cancellation action in which the Ninth Circuit held that doll names that had fallen into the public domain were invalid as trademarks and reasoning in part that "[t]here is nothing in this case to justify a conclusion that little Red Riding Hood, for instance, has a secondary meaning indicating that she is a Nancy Ann doll. The secondary meaning rule has no application to the facts here.").

### 3. The Court's December 16, 2008 Order

On August 25, 2008, the Court heard oral argument on the motions and, thereafter, took the motions under submission.

On December 16, 2008, the Court issued its Order Re: Plaintiff's Motion for Summary Judgment and a Permanent Injunction and Defendants' Motion for Summary Judgment, denying Plaintiff's motion and granting Defendants' motion in connection with Plaintiff's copyright infringement claim. After tracing the relevant portions of the long history of transfers of copyright interests in various aspects of works

in which Betty Boop appears and in the character herself, the Court concluded that "Plaintiff ha[d] not demonstrated a chain of title in the relevant cartoon films or the component parts thereof that leads to and terminates with Plaintiff. Stated otherwise, Plaintiff has not established its ownership of the Betty Boop cartoon character." Dec. 16, 2008 Order, 772 F.Supp.2d at 1152–53, at 30:26–31:3.

With its December 16, 2008 Order, the Court reserved ruling and ordered supplemental briefing regarding Plaintiff's trademark and unfair competition claims. The Court did so because the parties' existing briefing failed to address issues central to the determination of those claims. For example, Defendants' arguments for summary judgment were premised on a finding that the copyright for the Betty Boop character had fallen into the public domain, but the Court did not so find. *Id.* at 1153, at 32:6–9 ("[A]s the foregoing discussion of Plaintiff's copyright infringement claim demonstrates, the Court has not found that the Betty Boop character has fallen into the public domain.") At the same time, the Court pointed out that Plaintiff's briefing did not address "how its registered trademarks encompass the use of the *image* of Betty Boop" or "the nature or source of its common law trademark rights, if any, in Betty Boop *images.*" *Id.* at 1154, at 33:24–34:2 (emphasis added).[13] The Court further explained:

Among the other questions before the Court with these cross-motions for sum-

---

**13.** The sentence that immediately precedes the quoted passage noting the lack of briefing on the origins of Plaintiff's purported rights in the *image* of Betty Boop contains an error: "However, neither the argument nor the evidence before the Court makes clear whether Defendants' use and licensing of all, or portions of, the poster artwork for which it has valid copyright registrations infringe or otherwise impair Defendant's [sic] registered

marks for the *name* 'Betty Boop.' " Dec. 16, 2008 Order, 772 F.Supp.2d at 1154, at 33:19–23 (emphasis in original). As the Court noted in the first sentence of the same paragraph, the evidence submitted in support of Plaintiff's Motion related to registrations for word marks: "Here, Plaintiff has established by uncontroverted evidence ownership of four registered marks for the *name* 'Betty Boop.' " *Id.* at 1154, at 33:5–6 (emphasis in original).

mary judgment are: (a) whether the products Defendants sell and the rights Defendants license to others constitute a use of one or more of the marks Plaintiff owns, and (b) whether Defendants' use is likely to create confusion as to the origin of the products. Plaintiff's evidence of its trademark registrations indicate protection for a "word mark" for "Betty Boop."

Accordingly, the Court reserves ruling on the parties['] cross-motions for summary judgment in connection with Plaintiff's trademark and unfair competition claims. In light of the Court's ruling on Plaintiff's copyright claim, the parties are ordered to file supplemental briefing, setting forth their arguments and analysis of Plaintiff's trademark and unfair competition claims, addressing, *inter alia,* whether genuine issues of material fact exist in connection with whether Defendants['] use and licensing of the movie poster artwork (or its component parts) constitute a use of one or more of Plaintiff's marks and whether that use and licensing is likely to create confusion as to the origin of the resulting products.

*Id.* at 1154, at 34:2–18.

On January 30, 2009, the parties filed their opening supplemental briefs. On February 23, 2009, the parties filed their responsive supplemental briefs. Plaintiff filed declarations and exhibits in support of both of its supplemental briefs.[14] With their responsive supplemental brief, Defendants filed a declaration responding to a portion of the evidence Plaintiff had filed in support of its opening supplemental brief.[15]

### 4. Supplemental Briefing on Trademark and Unfair Competition Claims

Plaintiff's supplemental briefing carries forward with the premise that Plaintiff "owns incontestable federal trademark registrations and common-law rights in *both the name and image* of Betty Boop." Pl's Supp. Br. at 1:18–20 (emphasis added); *see also id.* at 3:18–21 (arguing regarding ownership that Plaintiff "owns incontestable federally registered marks in both the name and image of Betty Boop, as well as common law rights in an image and the physical appearance of Betty Boop"); *id.* at 4:3–5 ("[Plaintiff] possesses valuable trademark rights in the name and image of Betty Boop that arise from its commercial use of those marks over many decades.") Plaintiff goes on to present argument about how Defendants' merchandise infringes Plaintiff's name and image marks.

---

**14.** Defendants also filed a declaration and exhibits with its supplemental brief. However, part of the declaration and all of the pages attached·as an exhibit thereto were responsive to new evidence Defendants had received from Plaintiff since the issuance of the Court's December 16, 2008 Order. As Defendants explained, "On January 26, 2009, just four days ago [four days prior to the date the parties' opening supplemental briefs were due], Plaintiff provided Defendants' counsel a copy of a federal trademark registration for one of the images [of Betty Boop in which Plaintiff claims rights], which appears to be the same as the Betty Boop image on the second page of Plaintiff's Exhibit 39 [to Plaintiff's Motion, which consisted of copies of

product labels]." Defs' Supplemental Brief ("Defs' Supp. Br.") at 5:8–10.

**15.** The Court ordered supplemental *briefing;* the Court did not order or authorize the submission of additional evidence. The parties neither sought nor obtained leave to submit additional evidence in support of their claims or arguments. Defendants' Objections to Evidence Submitted by Plaintiff Fleischer Studios, Inc. in Support of Supplemental Memorandum on Trademark Infringement and Unfair Competition Claims are SUSTAINED. In its analysis of the merits, the Court did not consider or rely on any of the evidence submitted in support of the parties' supplemental briefs.

Regarding the *name* Betty Boop, Plaintiff inaccurately characterizes the Court's December 16, 2008 Order as finding that Plaintiff's word marks are incontestable.[16] The Court's Order did not so find, and the Court takes up the question of the status of those registrations in the discussion below.

Regarding its assertion of trademark rights in *an image and the physical appearance* of Betty Boop, Plaintiff introduces two potential points of origin. First, Plaintiff submits additional evidence in support of its supplemental briefing to establish its ownership of three federal trademark registrations for an image of Betty Boop. Plaintiff explained the production of the new evidence in a footnote:"

Fleischer Studios submitted [the] image with its motion and claimed trademark rights in it, but mistakenly claimed only common law rights, as opposed to additional incontestable registrations in the image. In fact, Fleischer Studios has three incontestable registrations in that image.

Pls' Supp. Br. at 4 n.1 (citations to declarations and exhibits omitted).[17] Second, Plaintiff argues that its common law trademark rights in Betty's Boop's image and general appearance arise out of Plaintiff's use of Betty Boop images "for the past 35 years in a way that gives it common law trademark rights in Betty Boop's image" and its use of "another specific image of Betty Boop that has been used on mer-

**16.** Plaintiff's supplemental briefing contains a number of statements that mischaracterize the findings and conclusions in the Court's December 16, 2008 Order. Counsel are advised that, whether intentional or the product of inartful drafting, such mischaracterizations are inappropriate and border on being unethical.

For example, Plaintiff states that the Court rules that Defendants' argument that the Betty Boop character is in the public domain for copyright purposes "does not apply because the character remains protected by copyright." Pl's Opening Supplemental Br. ("Pl's Supp. Br.") at 1:6–10 (citing the December 16, 2008 Order, 772 F.Supp.2d at 1147, 1153, 1153, at 20:8–11, 31:8–10, 32:6–9). However, the referenced portions of the Order state: (1) "Accordingly, Betty Boop, the cartoon character, was a protectable component part of the cartoon films that were copyrighted prior to July 1931"; (2) "Defendants oppose Plaintiff's Motion for Summary Judgment by contending that Plaintiff cannot prevail on its trademark claims because, once a copyright has expired, the right to copy the work passes to the public"; and (3) "However, as the foregoing discussion of Plaintiff's copyright infringement claim demonstrates, the Court has not found that the Betty Boop character has fallen into the public domain." The Court's finding that the Betty Boop cartoon character was a protectable element of copyrighted cartoon films and the Court's statement that it had *not* found that the character

had fallen into the public domain are not tantamount to a finding that the character remains protected by copyright.

Similarly, in the very next sentence, Plaintiff states that "[t]he Court also acknowledged that Fleischer Studios presented uncontroverted evidence that it has incontestable trademark registrations in the name Betty Boop." Pl's Supp. Br. at 1:10–12 (citing page 1154, 33 of the December 16, 2009 Order). The Court acknowledged no such thing. Rather, the Court acknowledged that Plaintiff had established ownership of "four *registered* marks" for the name Betty Boop. Dec. 16, 2008 Order, 772 F.Supp.2d at 1154, at 33:5–6 (emphasis added). Regarding incontestability, the Court acknowledged only that "Plaintiff *contends* that its trademark registration are more than five years old, qualifying them for 'incontestable' status under the Lanham Act." *Id.* at 1154, at 33:7–9 (emphasis added).

**17.** Plaintiff's footnote carries little weight in light of the opportunity both sides had to fully brief and submit relevant documentation in connection with their cross-motions for summary judgment. As noted *supra,* in footnote 14, the Court did not consider or rely on any of the evidence submitted in support of the parties' supplemental briefs. Plaintiff's supplemental briefing fails to argue that its registered "word marks" for the name Betty Boop can or do encompass the use of the *image* of Betty Boop.

chandise labels for about 12 years." *Id.* at 5:3–9. As a result of its common law trademark rights in Betty Boop's image, Plaintiff argues that it also has common law rights in a generalized "physical appearance" of Betty Boop. *Id.* at 5:20–6:13.[18]

Defendants' supplemental briefing focuses on Defendants' view that their use and licensing of their copyrighted Betty Boop poster artwork "neither constitutes a use of Plaintiff's marks nor is it likely to create or cause confusion as to the origin of the merchandise." Defs' Supplement Brief ("Defs' Supp. Br.") at 2:15–17. In the context of their argument regarding the factors considered in determining whether a likelihood of confusion exists, Defendants assert that Plaintiff's marks are not strong: "The fact that Betty Boop is a recognizable character does not mean that she indicates a source of merchandise." *Id.* at 10:19–20. Building on that notion in their responsive supplemental brief, Defendants somewhat inartfully argue:

> Plaintiff concedes, as it must, that third parties own intellectual property rights in Betty Boop. As an example, Plaintiff acknowledges that Republic owns the copyrights in the Betty Boop cartoons, and there are others who may claim character ownership. The fact that third parties may have rights to use

an item in certain ways might affect the item's ability to identify the party claiming trademark protection. *Tristar Pictures, Inc. v. Del Taco, Inc.,* 59 U.S. P.Q.2d 1091, 1093 (C.D.Cal.1999). In *Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 578 F.Supp. 911, 925 [ (S.D.N.Y.1983) ][,] the court noted that because Universal did not own all possible rights to the King Kong character and that other parties had ownership rights therein, as a matter of law[,] Universal could not show that customers identify Universal as the source of origin. Here, Plaintiff cannot establish that consumers identify Plaintiff as a single source of origin of Betty Boop. This, of course, is a fundamental requirement for proving trademark infringement, and Plaintiff cannot establish here a single source of origin.

Defs' Responsive Br. ("Defs' Resp. Br.") at 5:12–23.

In the alternative, Defendants argue that genuine issues of material fact related to their fair use defense preclude summary judgment in favor of Plaintiff.

With this Order, the Court considers the parties' cross-motions for summary judgment on Plaintiff's remaining claims.

---

**18.** Although it accurately reflects the subject matter of the opinion, the "quoted" sentence in the parenthetical for Plaintiff's citation to *Universal City Studios, Inc. v. J.A.R. Sales, Inc.,* 216 U.S.P.Q. 679, 682 (C.D.Cal.1982), does not appear on the cited page or elsewhere in the opinion. Additionally, Plaintiff's citation to *DC Comics, Inc. v. Filmation Associates,* 486 F.Supp. 1273, 1277 (S.D.N.Y. 1980), for the proposition that "use of characters in comic books and licensed animated series gave plaintiff trademark rights in general 'physical appearance' of characters as they appeared in those works" overstates the scope of the Southern District of New York's analysis and ruling. The court noted that courts within the Second Circuit had recog-

nized the physical appearance of entertainment characters as protectable "ingredients" of entertainment products. With respect to the parties and issues before it, the court concluded only that the defendant was not entitled to judgment as a matter of law on the plaintiff's false designation of origin claim on a theory that the Lanham Act was directed at uses of an entire series of characters that the defendant did not intend to pass off as originating from the plaintiff: "In short, we think that, as construed in this circuit, the Lanham Act, though not as broad as plaintiff would have it, is not as narrow as defendant contends. Thus, defendant is not entitled to judgment as a matter of law on claims 1 and 2." *Id.*

## II. DISCUSSION

Plaintiff's remaining claims are for (a) trademark infringement pursuant to 15 U.S.C. § 1114,[19] (b) false designation of origin pursuant to 15 U.S.C. § 1125(a),[20] (c) state law trademark infringement and unfair competition, and (d) deceptive trade practices.

As the party asserting trademark and unfair competition claims, Plaintiff has the burden of proof at trial and the initial burden of production at summary judgment. Defendants may satisfy their initial burden with respect to Plaintiff's claims by "by pointing out that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir.2000). If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Trademarks function as a designation of source or origin. See 15 U.S.C. § 1127 (defining "trademark" to include "any word, name, symbol, or device, or any combination thereof—(1) used by a person ... to identify and distinguish his or her goods ... from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown"). As the Trademark Trial and Appellate Board has explained:

> The salient question is whether the designation in question, as used, will be recognized in and of itself as an *indication of origin* for this particular product. That is, does this component or designation create a commercial impression separate and apart from the other material appearing on the label?

*The Procter & Gamble Company v. Keystone Automotive Warehouse, Inc.*, 191 U.S.P.Q. 468, 474 (TT & A Bd.1976) (emphasis added); *see also United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918) ("There is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed.... [T]he

19. The statute governing trademark infringement references infringement of registered marks and provides in pertinent part:

> (1) Any person who shall, without the consent of the registrant—
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offer-

> ing for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.
> 15 U.S.C. § 1114(1)(a)-(b).

20. "The Lanham Act confers standing on 'any person who believes that he is or is likely to be damaged' by another's use of a 'false designation of origin' on merchandise entering into commerce. 15 U.S.C. § 1125(a).... The crucial question is whether the prospective plaintiff has a reasonable interest that requires protection from the defendant's false representations." *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 526 F.Supp. 1187, 1193 (S.D.N.Y., 1981), *rev'd on other grounds*, 697 F.2d 27 (2d Cir.1982), *superseded by rule and statute on other grounds*.

right to a particular mark grows out of its use, not its mere adoption, its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.").

■■■ "To succeed on the merits, plaintiff must establish three elements: (1) that he owns the mark; (2) that the mark indicates the source of the [merchandise] ("secondary meaning"); and (3) that defendant's use of the mark is likely to create confusion as to the source of the recordings." *Culliford v. CBS, Inc.*, 222 U.S.P.Q. 497, 499 (D.D.C.1984) (referencing the test for trademark claims involving unregistered marks, to which the common law and the Lanham Act's Section 1125(a) apply); *see also Toho Co., Ltd. v. William Morrow and Co., Inc.*, 33 F.Supp.2d 1206, 1210 (C.D.Cal.1998) ("When trademark and unfair competition claims are based on the same infringing conduct, courts apply the same analysis to both claims. To succeed on a claim for trademark infringement or unfair competition, the moving party must establish: (1) ownership of the trademark at issue; (2) use by defendant, without authorization, of a copy, reproduction, counterfeit or colorable imitation of the moving party's mark in connection with the sale, distribution or advertising of goods or services; and (3) that defendant's use of the mark is likely to cause confusion, or to cause mistake or to deceive." (internal quotations and citations omitted)).

■■■ The Court begins its analysis with the question of ownership. "To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff must show that he or she is either (1) the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed trademark." *Halicki Films, LLC v. Sanderson Sales and Marketing*, 547 F.3d 1213, 1225 (9th Cir. 2008).

### 1. Common Law Trademark Rights

Plaintiff asserts ownership of common law trademark rights in Betty Boop's image and general appearance that arise from Plaintiff's use of Betty Boop images on merchandise since FSI NY2 entered into a merchandising agreement with King Features in 1972.[21]

■■■ Priority of use is sufficient to establish ownership of an unregistered trademark. *Halicki Films, LLC v. Sanderson Sales & Marketing*, 547 F.3d 1213, 1226 (9th Cir.2008); *see also Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use.... [I]t is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."). As the Ninth Circuit reiterated fairly recently:

> Trademark rights are acquired by the party that *first* uses a mark in connection with the sale of goods. A mark is used in the sale of goods when "it is placed in any manner on the goods ... or the displays associated therewith or on the tags or labels affixed thereto...."

*Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 756 (9th Cir.2006) (emphasis added)

**21.** Plaintiff does not argue, and the Court does not find, that Plaintiff's evidence of registration of the word mark for the name "Betty Boop" confers a constructive use date of first use for anything more than the word mark or for any date earlier than 1981. *See* 15 U.S.C. § 1057(c).

(internal citations omitted). "Under the principle of first in time equals first in right, priority ordinarily comes with earlier use of a mark in commerce. It is not enough to have invented the mark first or even to have registered it first." *Grupo Gigante SA De CV v. Dallo & Co., Inc.,* 391 F.3d 1088, 1093 (9th Cir.2004) (going on to explain that the "territoriality principle" provides that only priority of use in the United States is relevant).

■ Here, Plaintiff's claim to common law rights in Betty Boop's image and appearance is based only on its use of the image(s) since 1972. Although this represents decades of use, it does nothing to address the first use of Betty Boop as a mark. In fact, Plaintiff references the original FSI's authorization of Betty Boop merchandise in the 1930s. After acknowledging the original FSI's first use,[22] Plaintiff fails to address (a) the status or situs of any trademark rights in the intervening decades, particularly in light of the 1941 sale of the original FSI's assets to Paramount, or (b) what Betty Boop merchandise was offered to the public, and by whom, after the 1941 sale to Paramount. Accordingly, Plaintiff has not established, or submitted evidence sufficient to create a triable issue of fact regarding, its ownership of common law trademark rights in one or more image(s)—or, by extension, the physical appearance—of Betty Boop.[23]

To the extent that Plaintiff intended to argue that its trademark rights derive in some part from Harvey's assignment of its Betty Boop-related rights to FSI in 1980, or Republic's recognition of Plaintiff's rights in the Betty Boop character in its 1997 settlement agreement with Plaintiff, Plaintiff has not met its burden. As the Court previously discussed in connection with Plaintiff's arguments regarding the chain of title in the copyright interests Plaintiff asserted in this litigation, Plaintiff has not established how those agreements might be sufficient to transfer trademark rights in the Betty Boop character to Plaintiff.[24] *Cf. Mister Donut of America,*

22. Although Plaintiff fails to establish that Handman has personal knowledge or is otherwise competent to testify on the issue, his declaration statements are made in support of Plaintiff's assertion that the original FSI had and used trademark rights in the Betty Boop Character. *See, e.g.,* Handman Delc. ¶ 10 ("By 1932, Betty Boop was very popular. In apparent response to consumer demand, Fleischer Studios began licensing others to create Betty Boop merchandise based on its copyright and trademark rights in the character. Fleischer Studios formed another company, Fleischer Art Service, Inc., to handle this 'Betty Boop' merchandise, and a number of licenses were granted.").

23. The Court recognizes that courts that have upheld trademark rights in the physical appearance of characters have generally found secondary meaning associated with the characters. *Compare Universal City Studios, Inc. v. J.A.R. Sales, Inc.,* 216 U.S.P.Q. 679, 682 (C.D.Cal.1982) ("The physical appearance of the character 'E.T.' has acquired 'secondary meaning' and is understood by the public as meaning and referring to Universal and the motion picture 'E.T. The Extra–Terrestrial' "), *Walt Disney Co. v. Powell,* 698 F.Supp. 10, 12 (D.D.C.1988) (Mickey Mouse and Minnie Mouse as protected characters that have secondary meaning "of great value, favorable in all respects, and well-entrenched worldwide."), *and D.C. Comics, Inc. v. Filmation Associates,* 486 F.Supp. 1273, 1277 (S.D.N.Y. 1980) ("[T]he names and nicknames of entertainment characters, as well as their physical appearances and costumes" are "protectable under § 43(a) because the ingredient can come to symbolize the plaintiff or its product in the public mind."), *with Sony Pictures Entm't, Inc. v. Fireworks Entm't Group, Inc.,* 137 F.Supp.2d 1177, 1197 (C.D.Cal.2001) ("It is ... unclear how the purported 'trade dress' Plaintiffs described applies to the character Zorro or how it could identify Plaintiffs as Zorro's source.").

24. A relevant portion of the Court's December 16, 2008 Order discussed some of the numerous transfers of rights effected by Paramount:

All of Plaintiff's remaining chain-of-title arguments rely on "acknowledgments" of

*Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir.1969) ("The law is well settled that there are no rights in trademark alone and that no rights can be transferred apart from the business with which the mark has been associated.").

### 2. Federal Trademark Registrations

Plaintiff asserts that it has incontestable trademarks in the name and and image of Betty Boop.

■ The rights that flow from federal registration on the Principal Register include that the registration is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." 15 U.S.C.A. § 1057. However, as noted above, under the priority-of-use principle, it is not enough to be the first to have registered a mark. *Grupo Gigante*, 391 F.3d at 1093. "Registration does not create a mark or confer ownership; only use in the marketplace can establish a mark." *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 979 (9th Cir.2006).[25]

■ A registered mark becomes incontestable if the registrant files an affidavit with the United States Patent and Trademark Office ("PTO") stating that the mark has been in continuous use for five consecutive years subsequent to the dates of registration and is still in use in commerce. 15 U.S.C. § 1065. An incontestable registration is "conclusive evidence" of (1) the validity of the registered mark; (2) the registrant's ownership of the mark; and (3) the registrant's exclusive right to use the mark in commerce.[26] 15 U.S.C. § 1115(b).

Here, Plaintiff submitted evidence of the registration of four "word marks" for the

---

rights by third parties who came into rights by virtue of an initial purported transfer of rights from Paramount, *e.g.*, UM & M in 1955, Harvey in 1958, CBS in 1980. All but the Paramount–UM & M chain fail because they involve transfers of rights in works other than the pre–July–1931 cartoon films.

Dec. 16, 2008 Order, 772 F.Supp.2d at 1149, at 24:4–8. The Court then discussed the purported chain of title in the copyright in the Betty Boop character (a) from UM & M to National Telefilms Associates ("NTA"), which Plaintiff asserted became Republic Pictures ("Republic"), and (b) back to Plaintiff by virtue of a 1979 letter from NTA to the parent of FSI NY2's licensing agent and a 1997 settlement agreement entered into by Plaintiff and Republic. *Id.* at 1151–52, at 27:3–31:6. The Court concluded, in relevant part, that "[n]either NTA's 1972 acknowledgment in a letter nor the 1997 settlement agreement between Republic and Plaintiff effected a transfer of rights that are good as against the world. At most, these documents evidence the parties' recognition of rights effective only between the parties." *Id.* at 1152, at 30–19–22.

**25.** Defendants have not brought a claim challenging the validity of Plaintiff's word mark registrations. Additionally, Plaintiff has not made a separate claim to the "first use" of, or common law rights in, the word mark in the name "Betty Boop." Accordingly, to the extent that the foregoing analysis of Plaintiff's arguments for a common law trademark *image* of Betty Boop does not also effectively eliminate any claim to a word mark on the basis of federal registration conferring a constructive first-use date not earlier than 1981, the Court considers Plaintiff's claims on the basis of its registered word marks.

**26.** "[T]he incontestable status of [a] mark does *not* require a finding that the mark is strong" for purposes of the likelihood of confusion analysis. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n. 3 (9th Cir. 2002); *see also Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir.1988), *abrogated in part on other grounds by Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1116 n. 1 (9th Cir.1990) ("[A]n incontestable status alone does not establish a strong mark").

name "Betty Boop," but it did not file evidence of federal registrations for any Betty Boop images in support of its Motion for Summary Judgment or in opposition to Defendant's Motion for Summary Judgment. Additionally, Plaintiff filed no evidence that it filed the required affidavit with the PTO or otherwise obtained a determination from the PTO that the word mark is incontestable. Accordingly, the Court considers only the effect of Plaintiff's federal registrations for the word mark.

■ Plaintiff's evidence does demonstrate that Plaintiff has registered and used the name "Betty Boop" on merchandise sold under license from Plaintiff since 1972. Its federal registration is prima facie evidence of the validity and ownership of the word mark, and Defendants have not introduced any evidence to rebut the validity of that mark. However, nothing before the Court demonstrates: (a) that Plaintiff's word mark indicates a single source, (b) that any of Defendants' uses of its poster artwork represent a use of Plaintiff's word mark in commerce, or (c) that any of defendants' uses of the word mark are likely to cause consumer confusion. Accordingly, the Court concludes that Plaintiff's word mark registrations do not satisfy Plaintiff's burden with respect of any of its claims.

In light of the "fractured" history of intellectual property rights in works featuring Betty Boop, the Court finds the Southern District of New York's analysis in *Universal City Studios, Inc. v. Nintendo Co. Ltd.*, 578 F.Supp. 911 (S.D.N.Y. 1983), particularly instructive. The plaintiff in *Universal*, sought to enforce rights related to the character King Kong, which Universal alleged were infringed by Defendant Nintendo's use of a gorilla in its "Donkey Kong" video game. Nintendo moved for summary judgment on Universal's trademark and unfair competition claims. *Id.* at 913. Regarding the right Universal sought to assert in King Kong, the court explained:

> Universal claims that its gorilla is King Kong. Exactly who King Kong is, in the trademark sense, and what he looks like, is a key to this lawsuit. There is, of course, a King Kong, for those expatriates and hermits who don't know, who is the central character in a famous 1933 motion picture ("the 1933 movie") produced by RKO Radio Pictures, Inc. ("RKO") and in a remake of that motion picture (the "1976 remake") done by the Dino DiLaurentiis Corporation ("DDL") in 1976. Universal does not claim to own a trademark in these images of King Kong, but instead claims to be the owner of a trademark in the King Kong name and another King Kong character by virtue of certain recent assignments.

*Id.* at 914.[27] Addressing at least in part Nintendo's argument that Universal could not "claim a trademark in King Kong because the multiple origins and present uses of King Kong have made it impossible for King Kong to denote a single source of origin, which is the necessary function of a trademark," *id.*, the Court explained that

---

**27.** The factual background of the case revealed another source of rights in King Kong:

> The King Kong story first appeared in public with its publication in 1932 as a book and a magazine serial. Merian C. Cooper was the originator of the story that was the basis for the book and magazine serial. His son and heir, Richard Cooper ("Cooper") now holds the exclusive book

publishing rights with respect to King Kong, including the right to make, distribute or license novels, comic books or magazine articles using the King Kong name, character and story.

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 578 F.Supp. 911, 914 (S.D.N.Y.1983). The court went on to detail the ensuing long and complicated history of King Kong rights.

"[b]ecause of the competing property interests in King Kong, and considering third-parties' unauthorized use of King Kong trademarks for various products, King Kong no longer signifies a single source of origin to consumers and thus is not a valid trademark." *Id.* at 923 (concluding that "[i]t is this requirement—that a trademark indicate to consumers a single source of origin—that is fatal to Universal's claim."). The court further explained:

> The fatal vagueness of Universal's King Kong character is a result of a separate and equally fatal flaw in Universal's trademark claim: the conflicting ownership rights in the King Kong name and character. At this moment, RKO owns one photographic image of King Kong, DDL owns another and Universal owns some undetermined third image. Universal argues that RKO and DDL own only copyrights in their King Kong images—not trademarks—and that for this reason those rights do not present a barrier to Universal's establishment of secondary meaning in its King Kong character. However, Universal concedes-indeed, emphasizes-RKO's and DDL's extensive use and licensing of their King Kong images. Universal's position is thus that the consuming public, though confronted with extensive merchandising use of two King Kong images that represent other product sources, is still able to perceive that there is a distinct third image of King Kong that designates a third product source-Universal.
>
> As has been frequently stated in this and other opinions, the purpose of a trademark—and a requirement for the statutory protection granted to trademarks—is that the mark indicate to consumers a single source of origin. The presence in the market of other, unrelated producers with legally protected images that are very similar to plaintiff's—indeed, whose nature defines plaintiff's

mark—is fundamentally inconsistent with this requirement.

*Id.* at 925.

Here, as in *Universal,* merchandising intellectual property rights in a famous fictional character were divided and parceled out to various entities over many decades. In the context of these cross-motions for summary judgment, Plaintiff has not established trademark rights that are not in considerable conflict with other existing ownership rights in Betty Boop and the works in which she appears. Although there is no evidence of other current, authorized uses of Betty Boop trademarks, Plaintiff acknowledges that other entities retain copyrights in various Betty Boop works. Additionally, as discussed above, Plaintiff points to no evidence that its use since 1972 constitutes a first use, *e.g.,* that owners of rights in works in which Betty Boop is featured were not producing or selling Betty Boop merchandise at or near the time Plaintiff commenced its use in 1972.

Accordingly, for the reasons and in the manner set forth above, summary judgment is granted in favor of Defendants on Plaintiff's trademark and unfair competition claims because Plaintiff failed to produce evidence sufficient to establish, or to raise a triable issue of fact regarding (a) its ownership of rights in the image or physical appearance of Betty Boop or (b) how Defendants' use of the Betty Boop posters infringes Plaintiff's federally-registered word-mark in the name "Betty Boop."

### III. CONCLUSION

Those portions of Plaintiff's Motion for Summary Judgment (docket no. 48) that relate to Plaintiff's trademark and unfair competition claims are DENIED, and the corresponding portions of Defendants' Motion for Summary Judgment (docket no.

53) are GRANTED. Counsel for Defendant is directed to prepare and file a Judgment for the Court's signature within 20 days of the date of this order.

**IT IS SO ORDERED.**